**GUTRIDE SAFIER LLP**
SETH A. SAFIER (SBN 197427)
seth@gutridesafier.com
MARIE MCCRARY (SBN 262670)
marie@gutridesafier.com
TODD KENNEDY (SBN 250267)
todd@gutridesafier.com
HAYLEY REYNOLDS (SBN 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

KALI BACKER (admitted *pro hac vice*)
kali@gutridesafier.com
4450 Arapahoe Ave., Suite 100
Boulder, Colorado 80303
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| BRANDON BRISKIN on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SHOPIFY INC.; SHOPIFY (USA), INC.; and SHOPIFY PAYMENTS (USA), INC.,<br><br>Defendants. | CASE NO. 4:21-cv-06269-PJH<br><br>**PLAINTIFF'S OPPOSITION TO SHOPIFY INC.'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Date: April 28, 2022<br>Time: 1:30 p.m.<br>Judge: Hon. Phyllis Hamilton |

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. Defendants Take, Use, and Share Consumer Data Without Consent. ..... 2

B. Shopify Has Extensive Contacts With California. ..... 3

III. LEGAL STANDARD ..... 4

IV. ARGUMENT ..... 5

A. The Court Has Personal Jurisdiction Over Shopify. ..... 5

1. *Shopify purposefully directed its activities toward the forum.* ..... 5

2. *Plaintiff's claims relate to Defendants' contact with California.* ..... 9

3. *It is reasonable to exercise jurisdiction over Defendants in California.* ..... 10

B. The FAC Gives Defendants Adequate Notice Pursuant to Rule 8 ..... 11

C. Plaintiff Did Not Consent to Defendants' Tortious Conduct. ..... 11

1. *Browsewraps, like those at issue here, are unenforceable.* ..... 12

2. *Even if Defendants had a viable consent defense, the terms do not encompass Plaintiff's claims.* ..... 14

D. Plaintiff States a Claim Under § 631(A). ..... 17

1. *Defendants qualify as third-parties for liability under § 631.* ..... 18

2. *Defendants intercepted the "contents" of communications* ..... 19

E. Plaintiff States a Claim Under § 635 ..... 21

F. Plaintiff States a Claim For Privacy Violations Under The California Constitution And California Common Law Intrusion Upon Seclusion. ..... 23

G. Plaintiff States a Claim Under § 502 ..... 24

H. Plaintiff States a Claim Under The UCL. ..... 24

V. CONCLUSION ..... 24

# TABLE OF AUTHORITIES

## CASES


*Apple Inc. v. Superior Court*, 56 Cal. 4th 128 (2013) .... 24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .... 5

*Baton v. Ledger SAS*, 2021 U.S. Dist. LEXIS 215793 (N.D. Cal. Nov. 8, 2021) .... 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .... 5

*Bergstein v. Parmar*, 2014 WL 12586073 (C.D. Cal. June 23, 2014) .... 7

*Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535 (9th Cir. 1986) .... 12

*Calder v. Jones*, 465 U.S. 783 (1984) .... 6

*Campbell v. Facebook*, 315 F.R.D. 250 (N.D. Cal. 2016) .... 22

*Colgate v. JUUL Labs, Inc.,* 402 F. Supp. 3d 728 (N.D. Cal. 2019) .... 14

*College Source, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066 (9th Cir. 2011) .... 6

*Flanagan v. Flanagan*, 27 Cal. 4th 766 (2002) .... 25

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017 (2021) .... 9, 10

*Graham v. Noom, Inc.*, 533 F. Supp. 3d 823 (N.D. Cal. April 8, 2021) .... 20

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003) .... 5

*HiQ Labs, Inc. v. LinkedIn Corp.*, 938 F. 3d 985 (9th Cir. 2019) .... 7

*In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015) .... 19, 22, 24

*In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) .... 19, 26

*In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797 (N.D. Cal. 2020) .... 13

*In re Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784 (N.D. Cal. Sept. 26, 2013) .... 14, 16

*In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9 (1st Cir. 2014) .... 16

*In re Vizio, Inc.*, No. 8:16-ml-02693-JLS-KES, 2017 U.S. Dist. LEXIS 224572 (C.D. Cal. July 25, 2017) .... 22

*In re Zynga Privacy Litig*., 750 F.3d 1098 (9th Cir. 2014) ........................................ 19, 20, 22
*Kairy v. SuperShuttle Int'l*, 660 F.3d 1146 (9th Cir. 2011) ........................................ 25
*Kasky v. Nike, Inc.*, 45 P.3d 243 (Cal. 2002) ........................................ 28
*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ........................................ 13
*Lukis v. Whitepages, Inc.*, 454 F. Supp. 3d 746 (N.D. Ill. 2020) ........................................ 7
*Mavrix Photo, Inc. v. Brand Techs., Inc.,*647 F.3d 1218 (9th Cir. 2011) ........................................ 5, 7
*Myers v. Bennett Law Offices*, 238 F.3d 1068 (9th Cir. 2001) ........................................ 10
*Nguyen v. Barnes & Noble, Inc.*, 763 F. 3d 1171 (9th Cir. 2014)........................................ 14, 17
*Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064 (N.D. Cal. 2016)........................................ 27
*Picot v. Weston*, 780 F.3d 1206 (9th Cir. 2015)........................................ 11
*Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015) ........................................ 4
*Revitch v. New Moosejaw, LLC*, 2019 U.S. Dist. LEXIS 186955 (N.D. Cal. Oct. 23, 2019) ........................................ 21
*Ribas v. Clark*, 38 Cal. 3d 355 (1985)........................................ 25
*Rio Properties, Inc. v. Rio Intern. Interlink*, 284 F. 3d 1007 (9th Cir. 2002) ........................................ 6
*Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892 (9th Cir. 2013) ........................................ 13
*Rodriguez v. Google LLC*, 2021 U.S. Dist. LEXIS 98074 (N.D. Cal. May 21, 2021) ........................................ 26
*S.D. v. Hytto Ltd.*, 2019 WL 8333519 (N.D. Cal. May 15, 2019) ........................................ 7
*Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797 (9th Cir. 2004)........................................ 4
*Sher v. Johnson*, 911 F.2d 1357 (9th Cir. 1990) ........................................ 11
*Silver v. Stripe, Inc.*, 2021 U.S. Dist. LEXIS 141090 (N.D. Cal. July 28, 2021) ........................................ 16
*Svenson v. Google Inc*., No. 13-cv-04080-BLF, 2015 U.S. Dist. LEXIS 43902 (N.D. Cal., April 1, 2015) ........................................ 23
*United States Dep't of Justice* v. *Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989)........................................ 27
*Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987)........................................ 5
*WhatsApp Inc. v. NSO Grp. Techs., Ltd*., 472 F. Supp. 3d 649 (N.D. Cal. 2020) ........................................ 7
*Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043 (N.D. Cal. 2018) ........................................ 27

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) .......... 6

**STATUTES**

Cal. Pen. Code § 631(a) .......... 17

Cal. Penal Code § 502 .......... 24

Cal. Penal Code § 630. .......... 22

**OTHER AUTHORITIES**

18 U.S.C. § 2511(1)(a). .......... 17

Fed. R. Evid. 201(b) .......... 11

Fed. R. Evid. 901(b)(1) .......... 11

## I. INTRODUCTION

Few types of information are more private than a person's finances. The question at the heart of this case is whether Defendants Shopify Inc. ("Shopify"), Shopify (USA), Inc. ("Shopify USA"), and Shopify Payments (USA), Inc. ("Shopify Payments") (collectively "Defendants") can secretly track and collect intimate details about consumers' financial transactions, aggregate those details into profiles, and share the information with their own merchants and third parties to consumers' detriment. Defendants accomplish this surreptitious data collection by concealing their presence on merchants' websites with embedded software. When consumers begin the checkout process on a merchant's website, like IABMFG, for example, they go to a payment form that appears to belong to the merchant, and, as a result, believe they are communicating only with the merchant. In reality, however, Defendants generate the payment form and use it to intercept consumers' information to send directly to their own servers.

Because Defendants do not ask for permission from the outset, consumers have no idea what happens to their data. Behind the scenes, Defendants use it to build individual profiles and provide analysis on transactions to their merchants, thereby allowing them to profit from their unlawful conduct. Those merchants, in turn, use the information to prejudge consumers, including refusing to do business with some consumers entirely. Defendants also share consumer data with third parties, like Stripe, Inc., that also build their own consumer profiles. Because Defendants remain hidden at all points in the transaction, they deprive consumers of the right to opt out of the collection, use, and disclosure of their own data—a right protected under California law.

Given the lengths to which Defendants have exploited consumer data, it should come as no surprise that they launch a litany of defenses. They claim the Court lacks personal jurisdiction over them, even though Defendants subjected themselves to this forum by committing intentional acts that targeted California consumers and by doing business in the state. Defendants also rely on three policies—two of which were not even posted on websites Plaintiff viewed—to contend that Plaintiff consented to their conduct. Setting aside the absence of any proof that the policies were posted at the time of Plaintiff's purchase in 2019, the one policy Defendants claim was linked to the IABMFG checkout page is an unenforceable browsewrap policy.

Defendants' other arguments are equally flawed. The fact that IABMFG is a Shopify merchant does not change the fact that Defendants are eavesdroppers. Further, courts have held that the disclosure of credit information is highly offensive. For these reasons, the Court should deny Shopify's motion.

## II. BACKGROUND

### A. Defendants Take, Use, and Share Consumer Data Without Consent.

Defendants run an e-commerce platform that provides payment processing services to millions of merchants across the internet. Second Amended Complaint (SAC) ¶ 24. Defendants embed their software into merchants' websites. *Id*. When a consumer begins the checkout process with one of Shopify's merchant customers, the software makes it appear that the consumer communicates directly with the merchant. *Id*. at ¶¶ 1–2, 4, 25–35, 82. But, in reality, it sends no information to the merchant. *Id*. Rather, Defendants' software generates the payment form and directs to themselves all information entered into it. *Id*. Defendants also install cookies on users' browsers that track consumers' transactions across the Shopify merchant network. *Id*. ¶¶ 5, 38-41. Defendants do not inform consumers about any of this conduct. Because they conceal their involvement by, inter alia, omitting their branding from the payment forms, Defendants collect—without permission—sensitive private information, including consumers' full names, addresses, email addresses, credit card numbers, IP addresses, the items purchased, and geolocation. *Id*. ¶¶ 2–3, 40, 81.

Once Defendants collect the data, they can decipher what data emanates from California because they have consumers' billing addresses and geolocations. *Id*. If they wanted, they could end their intrusion there and disregard the data. Instead, Defendants take additional steps to use data from California and make it profitable for themselves and their merchants. One of the ways they do so is by compiling the data into individualized profiles. *Id*. ¶¶ 6, 42-45. Defendants share information within the profiles with their merchants. *Id*. The information is valuable to the merchants because they provide insights into consumers' creditworthiness before the transaction is final. *Id*. When a consumer from California makes a purchase, Defendants use the consumer's data to provide their merchants with an "analysis" of the order that cross-references the details of the

new transaction with the consumer's purchase history to identify potential areas of fraud. SAC, ¶ 43. Some indicators Defendants flag for their merchants include: the location of the IP address used to place the order, the distance of the shipping address from the IP address, whether the billing ZIP code "matches the credit card's registered address," and whether "[c]haracteristics of [the] order are similar to non-fraudulent orders observed in the past." *Id*. The analysis is a powerful tool; it gives Shopify merchants an advantage over retailers who do not use Defendants' services and the ability to reject the transaction altogether. *Id*. ¶¶ 43-45. Shopify promotes its "data advantage" and tells investors "[w]ith each new transaction processed, we grow our data proficiency." Declaration of Kali Backer ("Backer Decl."), Ex. 1 at 9. Defendants' "cloud-based infrastructure… consolidates data generated by the interactions between buyers and merchants' shops, as well as those of our merchants on the Shopify platform, providing rich data to inform both our own decisions as well as those of our merchants." *Id*.

In addition to building profiles and analyzing their data, Defendants also use Californians' data by sharing it with other non-merchant third-parties, such as Stripe and MaxMind, who, in turn, use the data to feed their own profiles on users. SAC ¶¶ 15-16, 46–47. Through these collective actions, Defendants directly target and exploit the California market.

**B. Shopify Has Extensive Contacts With California.**

Defendants' success, by their own admission, depends on their merchants' performance. Shopify explains: "[t]he more a merchant sells on our platform, the more revenue we generate as they process more transactions, upgrade plans, sell through new sales channels, ship more products, and use additional solutions." Backer Decl., Ex. 1 at 15. Indeed, Shopify "consider[s] our merchants' success to be one of the most powerful drivers of our business model." *Id*. By designing its software to accept payment transactions with California consumers, Shopify made the decision to enter the California market since, without it, its merchants—as well as Defendants — would be deprived of a huge sector of consumers.

Shopify's efforts to drive sales in California go beyond simply making its software available for use by Californians. Shopify actively courts California merchants who it knows are doing business with California consumers. For instance, Shopify often touts Kylie Cosmetics as

one of its largest merchants. Backer Decl., Ex. 3; *see also* SAC ¶ 10. Until recently, Kylie Cosmetics operated exclusively online. *Id*. But in 2017, Shopify built a Kylie Cosmetics pop-up store in Los Angeles, California with the goal of learning more about its base of consumers. *Id*. Shopify sent members of its own team as well as hired an agency to secure workers to run the store. *Id*. Shopify now markets that pop-up as a success story that its other merchants can model. *Id*.

In 2018, Shopify deepened its ties with California when it opened a physical store in Los Angeles to serve as a hub where its merchants can learn about its products and receive "business advice" and "learn about the company's online platform." Backer Decl., Ex. 2; *see also* SAC ¶¶ 11-12; Backer Decl., Ex. 1. It selected Los Angeles because, as one Shopify Inc. executive explained, "the region is one of our densest in customer base." *Id*.; *see also* SAC ¶ 12. As of 2018, California was home to over 80,000 Shopify merchants with 10,000 in Los Angeles alone. *Id*. Recently, an online journal reported that Shopify LA "added a pop-up shop for local brands to sell their goods" and "features several local merchants' products visitors can purchase." *Id*., Ex. 4. The "Shopify LA team" will identify "three to six merchants to be featured at one time" and "brands will be rotated on a monthly to quarterly basis." *Id*. Through that store, Shopify markets and sells the payment processing services that enable it to collect even more consumer data as well as help its merchants connect directly with California consumers.

## III. LEGAL STANDARD

"Where, as here, the defendant's motion [to dismiss for lack of personal jurisdiction] is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand" it. *Ranza v. Nike, Inc*., 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted). The Court must accept Plaintiff's uncontroverted allegations as true, and resolve any factual disputes in conflicting affidavits in the plaintiff's favor. *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800 (9th Cir. 2004).

To survive a Rule 12(b)(6) motion, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must accept all factual allegations as true and draw all reasonable inferences in favor of the

plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). This is not akin to a "probability requirement." *Id.*

## IV. ARGUMENT

### A. The Court Has Personal Jurisdiction Over Shopify.

California's long-arm statute permits the exercise of personal jurisdiction to the fullest extent allowed by the Due Process Clause. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003). Jurisdiction comports with due process when the defendant has minimum contacts with the state. *Ranza*, 793 F.3d at 1068. For cases involving tortious conduct, such as here, the Ninth Circuit uses the following test to determine whether a non-resident defendant is subject to specific personal jurisdiction: (1) the non-resident defendant must purposefully direct his activities toward the forum; (2) the claim must arise out of or relate to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., be reasonable. *Mavrix Photo, Inc. v. Brand Techs., Inc.,* 647 F.3d 1218, 1228 (9th Cir. 2011).

Plaintiff bears the burden of proving the first two prongs. *Id*. If Plaintiff succeeds, the burden shifts to Defendants to "set forth a compelling case that the exercise of jurisdiction would not be reasonable." *Id. at* 1212. Shopify's brief focuses exclusively on the first two factors, so the last prong is not in dispute. *See* ECF 51 at 8-10.

#### 1. *Shopify purposefully directed its activities toward the forum.*

The "purposeful direction" element is straightforward. All it requires is a showing that defendants (1) committed an intentional act, (2) expressly aimed at the forum state, and (3) caused harm that the defendant knew was likely to be suffered in the forum state. *See Calder v. Jones*, 465 U.S. 783, 789–90 (1984). The inquiry focuses on "where the consequences of a defendant's actions were felt, rather than where the actions occurred." *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1205–06 (9th Cir. 2006). Thus, jurisdiction is proper even if the defendant's "only contact with the forum state is the purposeful direction of a foreign act having

effect in the forum state." *See College Source, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076–77 (9th Cir. 2011) (internal citation omitted).

In *Mavrix Photo,* the Ninth Circuit considered when tortious conduct on a nationally accessible website is expressly aimed at a particular forum. It explained that the "maintenance of a passive website alone cannot satisfy the express aiming prong." *Mavrix Photo, Inc*., 647 F. 3d at 1229. But, "operating even a passive website in conjunction with 'something more' — conduct directly targeting the forum — is sufficient." *Id*. A defendant does "something more" when a defendant "specifically targeted" consumers in a state, *Rio Properties, Inc. v. Rio Intern. Interlink*, 284 F. 3d 1007, 1020 (9th Cir. 2002), or when a defendant exploits the state market for its own commercial gain, *Mavrix Photo*, 647 F. 3d at 1229. Shopify did both.[1]

This case is nearly identical to *Lukis v. Whitepages, Inc.*, 454 F. Supp. 3d 746 (N.D. Ill. 2020), where the defendant website operator was found to have done "something more." There, the plaintiff alleged that Whitepages "knowingly searches for and obtains private and public records regarding Illinois residents," "profiles them in free previews," and "sells monthly subscriptions for background reports that it prepares from those records." 454 F. Supp. at 757. The court held the "actions qualify as the kind of 'intentional contacts… with [Illinois]' required for the exercise of specific jurisdiction." *Id.*

Here, just as in *Lukis*, Defendants knowingly obtained data from California residents through the software code they embedded in their merchants' websites.[2] SAC ¶¶ 1–5, 24–41. They

---

[1] To that end, Defendants' attempt to silo the jurisdictional analysis into two separate "theories"—one based on Defendants' collection, use and disclosure of Californians' data and the other rooted in Shopify Inc.'s physical contacts with California—is simply wrong. *See* ECF 51 at 8-10. The Ninth Circuit, in *Mavrix Photo*, made clear that *all* of these contacts are to be examined *collectively* as factors in determining whether a defendant has done "something more" than simply operate a passive website. 647 F. 3d at 1229.

[2] Purposefully embedding code on consumers' devices to collect and compile their personal financial information is an intentional act. *See HiQ Labs, Inc. v. LinkedIn Corp*., 938 F. 3d 985, 1001 (9th Cir. 2019) (analogizing a CFAA cause of action to a digital "breaking and entering" and a "trespass" offense)*; WhatsApp Inc. v. NSO Grp. Techs., Ltd*., 472 F. Supp. 3d 649, 661–62 (N.D. Cal. 2020) (sending code to servers and accessing them without authorization was an intentional act); *S.D. v. Hytto Ltd.*, 2019 WL 8333519, at *2–8 (N.D. Cal. May 15, 2019) (wiretapping is an intentional act); *Bergstein v. Parmar*, 2014 WL 12586073 at *3–4 (C.D. Cal. June 23, 2014) (recording telephone conversations is an intentional act).

knew they acquired data from California because they collected consumers' geolocations and billing addresses. *Id*. ¶¶ 7, 40, 51, 59, 81. But they did much more than simply collect data through their code. Rather, Defendants then took additional steps voluntarily to make use of the data behind the scenes, while knowing the data originated from California. In doing so, they targeted Californians for their own profit. As in *Lukis*, Defendants compiled the data into individualized profiles. SAC ¶¶ 7, 42-45, 103, 115, 124. They then leveraged their ability to synthesize the data by giving their merchants an "analysis" of the details of the particular transaction and how it compares to the consumers' purchase history. *Id*. The value in the analysis is due to Defendants' aggregation of data. No single merchant could create such an analysis on their own. Only Defendants can provide such insights because they track consumers' transactions across their entire merchant network. These direct uses of Californians' data caused injuries that occurred in California, including the invasion of privacy. *Id*. at ¶¶ 81-87, 94-96, 104-05, 114–118.

Beyond Defendants' uses of Californians' data, Defendants also exploited the California market. In *Mavrix Photo*, the defendant exploited the California market because it made "money by selling advertising space on its website to third-party advertisers: the more visitors there are to the site, the more hits that are made on the advertisements; the more hits that are made on the advertisements, the more money that is paid by the advertisers" to the defendant. *Mavrix Photo, Inc.*, 647 F.3d at 1230. The Ninth Circuit concluded that "[a] substantial number of hits to [the defendant's] website came from California residents" since "some of the third-party advertisers on [the defendant's] website had advertisements directed to Californians." *Id*. at 1225-26. Thus, it was "immaterial" whether the third-party advertisers or the defendant specifically targeted California residents. *Id*. at 1230. The defendant exploited the California market because it had actual or constructive knowledge about its California user base and profited from California "by selling space on its website for advertisements." *Id*.

Here too, the SAC alleges that Defendants make money by selling their e-commerce platform to third-party merchants and charging fees based on the goods sold on the Shopify merchants' websites. SAC ¶ 12. The more goods sold on the Shopify merchants' site, the higher the fees, and the more Defendants profit. *Id*.; *see also* Backer Decl., Ex. 1 at 15. Just as the Ninth

Circuit concluded in *Mavrix Photo*, it is reasonable to conclude that a "substantial number of hits to [Shopify's merchant's websites] came from California residents" since Shopify had actual knowledge that its merchants generated business from California. We know this because Shopify solicited California consumers *directly* on behalf of its merchants by setting up pop-up shops in the state and sending California consumers emails and text messages. *See* Backer Decl., Exs. 3–4; *see also* SAC, ¶¶ 36-37, 56, 62. Shopify even physically entered the state and opened a store in Los Angeles.[3] *Id*. ¶¶ 11-12. A Shopify vice president explained, "[i]t made sense for us to debut in the Los Angeles market as the region is *one of our densest in customer base*." *Id*. ¶¶ 12 (emphasis added.) As of 2018, Shopify had over 80,000 merchants in California with 10,000 in Los Angeles alone. *Id*. at ¶ 12. These facts accordingly demonstrate that being haled into court in California was not only foreseeable, but likely expected. Shopify does not dispute any of this.

Defendants' briefs pretend as if all of their alleged contacts with California are fortuitous because they provide services "nationwide and globally," and that the contacts result from the actions of their merchants, not themselves. ECF 51 at 9; *see also* ECF 53 at 12. But, as explained above, that is simply not true. Defendants knowingly take Californians' data and further process that data for their own commercial benefit. Shopify, in particular, also markets directly to California consumers and merchants. Backer Decl., Exs. 3–4; *see also* SAC, ¶¶ 11-12, 36-37, 56, 62. These contacts are completely of Defendants' own making and constitute direct and purposeful contact with the forum that gives grise to Plaintiff's claims. *See Lukis*, 454 F. Supp. 3d at 757.

Defendants also rely on *Baton v. Ledger SAS*, 2021 U.S. Dist. LEXIS 215793 (N.D. Cal. Nov. 8, 2021) to resist jurisdiction. But none of the facts asserted here were at issue in that case. In *Baton*, the plaintiff argued that the court had specific jurisdiction over Defendants because one of their merchants, Ledger, derived 7% of its business from California. *Id*. at *15–16. The court refused to graft Ledger's contacts with California onto Shopify Inc. or Shopify (USA), Inc.

[3] Defendants submitted declarations attesting that Shopify does not have any employees in California. *See* ECF 51-8 at ¶ 5. At a minimum, the articles accompanying the declaration conflict with that assertion since Shopify Inc. represents that it has a store in Los Angeles. *See* Backer Decl., Exs. 1–4.

because the "contacts must be the defendant's own choice." *Id*. Here, by contrast, Plaintiff alleges that Shopify itself had direct contacts with California through the code it sent to users, its collection of Californians' data, its creation of profiles about Californians, its knowing analysis of Californians' data, and through its deep business ties to the state, including the direct solicitation of Californians on behalf of its merchants.

**2. *Plaintiff's claims relate to Defendants' contact with California*.**

A fundamental flaw with Defendants' personal jurisdiction argument is it limits the second prong of the specific jurisdiction analysis to only those claims that "arise out" of forum-related activities. ECF 49 at 9-10. The test is not so narrow, and, in fact, last year, the Supreme Court squarely rejected Defendants' characterization in *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017 (2021).

There, Justice Kagan explained that, while the second prong "serves to narrow the class of claims" available for specific jurisdiction, "[n]one of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." *Id*. at 1026. Rather, the suit need only "arise out of *or relate to* the defendant's contacts with the forum." *Id*. Thus, the "back half" of the rule "after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id*.

As is the case here, Ford had contacts that "related" to the claims in that case because it had extensive business ties to the relevant states even though it did not sell the precise cars at issue there. *Id*. at 1027-1030. By selling and advertising the two car models in both states, "Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States." *Id*. at 1021.

Here, Plaintiff's injuries arise from Defendants' contacts with the state (i.e., Defendants' transmission of code to Californians' devices, collection of Californians' data, and profiling of Californians without consent).[4] *See* SAC ¶¶ 1-5, 7, 24-46, 51-54, 59-66, 80-85, 92-96, 103-05,

---

[4] To demonstrate that its claims "arise out" of forum-related activities, a "Plaintiff[] must show that [it] would not have suffered an injury 'but for' [the Defendant's] forum related conduct." *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001).

110-115, 123-125, 131-45. Plaintiff's lawsuit also "relates to" Defendants' contacts with California. Just like Ford, Shopify advertises and sells the product that harmed Plaintiff (Shopify Payments) in California to California merchants through its Los Angeles store. As did Ford, Shopify accordingly "enjoys the benefits and protection of [California's] laws"— "the enforcement of contracts, the defense of property, the resulting formation of effective markets." *Ford Motor Co.*, 141 S. Ct. at 1029. Thus, it can hardly be surprising or "said to be undue" to subject Defendants to jurisdiction in California. *Id*. at 1030.

**3. *It is reasonable to exercise jurisdiction over Defendants in California.***

The final element assesses whether it is reasonable to exercise jurisdiction over the defendant. Unlike the other two prongs, the burden of persuasion lies with the defendant. Only when a defendant makes "a ***compelling case*** that the exercise of jurisdiction would not be reasonable" is it possible to defeat jurisdiction on this basis. *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015); *see also Sher v. Johnson*, 911 F.2d 1357, 1364 (9th Cir. 1990) (once court finds purposeful availment, it must presume that jurisdiction would be reasonable).

Here, Defendants failed to make *any* case, let alone a *compelling* case, that jurisdiction is not reasonable since neither of their briefs even mentions this prong. Even if they had made an effort to address this point, Defendants cannot meet their burden.

First, litigating in California does not impose a major burden on Defendants since they both already have a presence in California. Shopify has a physical store in Los Angeles, (SAC ¶¶ 11-12), and both Shopify Payments and Shopify USA each have a quarter of their respective employees in California. ECF 30-9, ¶¶ 7–8; ECF 53-1, ¶ 7. Third, both California and Plaintiff have a strong interest in litigating this suit in California since Plaintiff is a California resident who seeks to represent a class of California consumers, and "California maintains a strong interest in providing an effective means of redress for its residents tortiously injured in California." *WhatsApp Inc.*, 472 F. Supp. 3d at 677. Finally, Defendants have not made any showing – in their briefing, initial disclosures, or otherwise – as to where their witnesses and evidence are located. In any event, the Ninth Circuit recognizes that "modern advances in communications and transportation have significantly reduced the burden of litigating in another [forum]." *Sinatra,* 854

F.2d at 1199.[5]

**B. The FAC Gives Defendants Adequate Notice Pursuant to Rule 8.**

As explained in Plaintiff's Opposition to Shopify USA's Motion to Dismiss the Second Amended Complaint (Pl. Opp. Shop. USA Br.), the SAC pleads facts sufficient to give Defendants adequate notice under Rule 8. *See* Pl. Opp. Shop. USA Br. § IV(B). The same reasons make dismissal unwarranted on this basis.

**C. Plaintiff Did Not Consent to Defendants' Tortious Conduct.**

Defendants submit three policies that they claim bound Plaintiff when he used IABMFG's website. *See* ECF 51 at 10-13. None of the webpages on IABMFG's site told users that they assent to the policies by simply using the website. Making matters worse, IABMFG posted a ***completely different*** privacy policy on its homepage and merchandise pages that ***does not even mention Shopify***—a glaring fact that Defendants did not bother to address in their briefing. SAC ¶ 61; *see also* Backer Decl., Ex. 6; ECF Nos. 51-53.

Ultimately, however, the Court need not consider these policies because consent is an "exception," i.e., a defense, to an otherwise unlawful privacy invasion, and something "Defendants have the burden to establish." *In re Google Assistant Privacy Litig*., 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020). A court can consider such a defense at this stage only if it "is obvious on the face of a complaint." *Rivera v. Peri & Sons Farms, Inc*., 735 F.3d 892, 902 (9th Cir. 2013).

Here, Defendants cannot meet their burden because Plaintiff denies that he consented to the policies. SAC ¶ 61. Even if he had not, the policies and checkout screens (Exs. A-F to Declaration of Jacob Heath) are improper for judicial notice because Defendants completely fail to authenticate them. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Authentication requires ***competent*** testimony concerning the document. Fed. R. Evid. 201(b); Fed. R. Evid. 901(b)(1).

[5] Plaintiff makes these arguments based on the evidence available to him without discovery. Should the Court determine a more satisfactory showing of facts is necessary, Plaintiff requests leave to take jurisdictional discovery. Plaintiff requests two two-hour depositions with each of the Defendants and leave to serve the discovery requests attached as Ex. 7 to the Backer Decl. in addition to merits discovery should this case proceed. Because this evidence is available only to Defendants, the Court should grant limited jurisdictional discovery. *See e.g*., *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) ("Discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary").

Defendants fail to carry their burden to authenticate each of the proffered policies and checkout screens since Defendants' counsel, Jacob Heath declares, without more, that the versions of the documents attached as Exhibit A-F are copies of documents "incorporated by reference" without stating when the documents were downloaded. *See* ECF 51-1; ECF 52-1; ECF 53-2. Given that Plaintiff's IABMFG purchase was in 2019 (SAC ¶ 57), there is no way to verify, or otherwise ascertain, from Defendants' attorney's declaration, if the same versions of the webpages (or policies) were present ***at the times relevant to the allegations***. Indeed, it is dubious that Defendants' counsel would even know this information since he does not represent IABMFG. And, this is clearly not something that Defendants can remedy since they did not even try to do so in the course of this second round of motion to dismiss briefing. The Court, thus, can easily dispense with Defendants' consent argument.

**1. *Browsewraps, like those at issue here, are unenforceable.***

Defendants' consent defense also fails because it is black letter law that parties cannot consent to terms of which they have no actual or constructive notice.[6] *See, e.g.*, *In re Google, Inc. Gmail Litig*., 2013 U.S. Dist. LEXIS 172784, at *47 (N.D. Cal. Sept. 26, 2013). Moreover, the Ninth Circuit holds that browsewrap policies that merely provide hyperlinks to the agreements—like those that Defendants seek to enforce here—are not enforceable because they typically fail this fundamental tenet of contract law. *See Nguyen v. Barnes & Noble, Inc*., 763 F. 3d 1171, 1175–6 (9th Cir. 2014). This case should be no different.

Contracts formed over the internet come in three varieties: clickwrap, browsewrap, and sign-in wrap agreements. *Id*. *See also Colgate v. JUUL Labs, Inc.,* 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019) (discussing different forms of online contracts). The difference between these agreements matters because courts typically do not enforce browsewrap agreements, but they typically do enforce clickwrap and sign-in wrap agreements. *Id*.

Clickwrap agreements require users "to click on an 'I agree' box after being presented with

[6] It is undisputed that Mr. Briskin did not have actual notice of the policies that Defendants seek to enforce here. The FAC alleges that he did not have notice of them, SAC ¶ 61, and Defendants do not offer any evidence suggesting otherwise. *See* ECF 51-53. The question thus boils down to whether there was constructive notice.

a list of terms and conditions of use." *Id*. Sign-in wrap agreements "are those in which a user signs up to use an internet product or service, and the signup screen states that acceptance of a separate agreement is required before the user can access the service." *Colgate*, 402 F. Supp. 3d at 763. Browsewrap agreements, by contrast, occur "where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen* at 1176. "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Id.* at 1175–76.

The policies at issue here are classic browsewrap agreements. None of IABMFG's webpages forced users to click on an "I agree" box before proceeding with a transaction or included any language stating that agreement to the policies is a prerequisite to accessing the site. Accordingly, the policies do not qualify as clickwrap or sign-in wrap agreements. *Id.; see also Colgate,* 402 F. Supp. 3d at 763.

Because IABMFG's checkout webpages simply provide hyperlinks to the policies that are visible to users only if they scroll down to the bottom of each page, they are similar to the browsewraps in *Nguyen*. *See* Exs. A-C to Heath Decl. There, the defendant's Terms of Use were "available via a 'Terms of Use' hyperlink located in the bottom left-hand corner of every page on the Barnes & Noble website, which appears alongside other hyperlinks". *Id*. at 1174. The "hyperlinks also appear[ed] underlined and set in green typeface in the lower lefthand corner of every page in the online checkout process." *Id*. The defendant in *Nguyen* argued—as Defendants do here—that the user had constructive notice of the Terms of Use because the hyperlinks were "in close proximity to the buttons a user must click on to complete an online purchase." *Id*. at 1177. The Ninth Circuit disagreed, holding that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id.* at 1178–79.

If anything, the hyperlinks are even more problematic in this case because IABMFG posted

an ***entirely different privacy policy*** on its webpages displaying its merchandise that does not even mention Shopify or the fact that Defendants collect, aggregate, and disclose user data. SAC ¶ 61. In other words, the policies that Defendants seek to enforce here were not even available on the most obvious pages where a consumer would look since they were not on IABMFG's home page or merchandise pages. *Id*. Indeed, a reasonable consumer could easily scroll down to the bottom of IABMFG's home page, click on the privacy policy, and believe that that policy—and no other policy—set forth the terms of use for her data. And, it would also be reasonable for the consumer to go through the checkout process believing that it linked to the same policy. "Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." *Nguyen*, 763 F. 3d at 1177. That principle bars enforcement of the policies here.

Defendants completely ignore *Nguyen*'s binding precedent and do not even attempt to distinguish that case. Defendants, instead, ask this Court to apply case law that is irrelevant. *See* ECF 51 at 12–13. *Silver*, the case Shopify calls "instructive," involved a *sign-in agreement*, not a browsewrap agreement. *Silver v. Stripe, Inc.*, 2021 U.S. Dist. LEXIS 141090, at *9 (N.D. Cal. July 28, 2021) ("Here, no dispute exists that Instacart utilized a 'sign-in wrap' agreement"). Unlike the webpages here, in *Silver*, the relevant website expressly stated, right above the check-out button, "By placing your order, you agree to be bound by the Instacart Terms of Service and Privacy Policy". *Id.*; *see also Silver*, No. 4:20-cv-08196, ECF No. 21 at 13. Here, none of the webpages include any of that language, or anything remotely informing users that their use of the website binds them to IABMFG's terms. *Silver* also did not involve two different privacy policies. *Nguyen* is more applicable to this case. The Ninth Circuit's ruling in that case forecloses enforcement of the policies here.

#### 2. *Even if Defendants had a viable consent defense, the terms do not encompass Plaintiff's claims.*

In the event the Court finds that Plaintiff consented to the policies, his claims still survive because the policies' terms do not cover Plaintiff's claims. After all, consent is not an all-or-nothing proposition: "A party may consent to the interception of only part of a

communication or to the interception of only a subset of its communications." *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 19 (1st Cir. 2014); *In re Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *47.

Defendants argue that Plaintiff consented to *all the conduct* that forms the basis of the SAC through a patchwork of policies—two of which were not even posted on the webpages Mr. Briskin visited. *See* ECF 51 at 10-13; ECF 52 at 11; ECF 53 at 14.

As an initial matter, the only policy that is marginally relevant is the IABMFG Checkout Policy (Ex. D to Heath Decl.) since Defendants do not even try to argue that Plaintiff consented to the policies posted exclusively on Shopify's website (Exs. E and F to Heath Decl.). *Id*. And, for good reason. They obviously fail to provide adequate notice under the Ninth Circuit's rubric. *See Nguyen*, 763 F. 3d at 1175–9. Indeed, the IABMFG Checkout Policy does not disclose the terms of the Shopify policies or state that they bind users; rather, it merely states that users "may also want to read" the Shopify-specific policies and includes URLs (not hyperlinks) buried deep within other terms. *See* Ex. D to Heath Decl. The Ninth Circuit refuses to find consent in such circumstances. *See Nguyen*, 763 F. 3d at 1175–9.

Defendants' reliance on the IABMFG Checkout Policy is also a dead end because that policy does not disclose the conduct at issue in this case, which can be put into three categories: 1) Defendants' use of the consumer data it intercepts and collects to generate individualized profiles and provide analysis to their merchants, *see, e.g.*, SAC ¶¶ 5, 6, 42-45, 51, 81; 2) Defendants' disclosure of data collected to their merchant customers and other third parties like Stripe, *see e.g.*, *id.* ¶¶ 2–3, 40-47, 51, 62; and 3) Defendants' interception of communications that include sensitive payment information, *see, e.g.*, *id*. ¶¶ 4, 24-37, 51, 59-60, 81-82.

None of the provisions in the IABMFG Checkout Policy discuss the first and second categories. And, Defendants do not point to any provisions suggesting otherwise. *Silver*—the primary case upon which Defendants—acknowledged that a policy's silence about certain conduct defeats any argument about consent to that conduct. *Silver*, 2021 U.S. Dist. LEXIS 141090, at *17–*18. Such is the case here, at a minimum, for the first two categories of conduct.

The provision upon which Shopify relies states:

> Our store is hosted on Shopify Inc. They provide us with the online e-commerce platform that allows us to sell our products and services to you. Your data is stored through Shopify's data storage, databases and the general Shopify application. They store your data on a secure server behind a firewall.
> Payment:
> If you choose a direct payment gateway to complete your purchase, then Shopify stores your credit card data. It is encrypted through the Payment Card Industry Data Security Standard (PCI-DSS). Your purchase transaction data is stored only as long as is necessary to complete your purchase transaction. After that is complete, your purchase transaction information is deleted.
>
> * * *
>
> For more insight, you may also want to read Shopify's Terms of Service (https://www.shopify.com/legal/terms) or Privacy Statement (https://www.shopify.com/legal/privacy).

Ex. D to Heath Decl.; *see also* ECF 29 at 10; ECF 30 at 10.

The IABMFG Checkout Policy does not apply to the third category of Defendants' conduct either—their interception of communications with private information. First, the IABMFG Checkout Policy refers only to Shopify Inc. so there is not any colorable argument that Plaintiff consented to Shopify USA's or Shopify Payments' conduct. Second, the Policy does not disclose that certain types of information are collected, including: the consumer's

- full name;
- home and/or delivery address;
- billing address;
- telephone number;
- email address;
- internet IP addresses;
- the item(s) purchased from the merchant;
- the brand and model of the consumer's computers or electronic devices;
- the identities of the consumer's browsers;
- the operating systems that the consumer's devices were using;
- the unique tracking codes, which enable Defendants to identify a particular consumer and track his or her activities across its entire merchant network.

SAC ¶ 81. Indeed, a reasonable consumer could read the IABMFG Checkout Policy and conclude that Shopify collects only "credit card data" if the consumer "choose[s] a direct payment gateway to complete [the] purchase." It is not even clear a consumer would understand what a "direct payment gateway" means. Moreover, a reasonable consumer could read the reference to "credit card data" to mean, at most, the credit card number and CVV. It would also be reasonable to

assume that "purchase transaction information" either coincides with or is a subset of the "credit card data" collected since the provision states that Shopify stores users' "credit card data" and then goes on to specify when it will delete "purchase transaction information." Further, while the IABMFG Checkout Policy identifies some Shopify cookies, it does not identify *any* of the tracking cookies identified in the SAC or the data they collect. *Id*. at ¶¶ 38-39, 61.

All in all, the Policy does not give Defendants a *carte blanche* to collect any and all consumer data, to use that data for their own commercial advantages, and disseminate that data to third parties. Plaintiff's claims accordingly still survive even if the Court were to consider the Policy.

### D. Plaintiff States a Claim Under § 631(A).

CIPA prohibits any person from using electronic means to "learn the contents or meaning" of any "communication" "without consent" or in an "unauthorized manner." Cal. Pen. Code § 631(a). Courts perform the same analysis for both the federal Wiretap Act and CIPA. *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 606–07 (9th Cir. 2020). The Wiretap Act makes liable any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." *Id.* § 2510(8). "Contents" of communications do not include "record information." *In re Zynga Privacy Litig*., 750 F.3d 1098, 1107 (9th Cir. 2014). The distinction between "contents" and "record information" is largely in how the information is generated: "record information regarding the characteristics of the message that is generated in the course of the communication" is not included in the definition of "contents." *Id*. at 1106; *In re Carrier IQ, Inc., Consumer Privacy Litig*., 78 F. Supp. 3d 1051, 1082 (N.D. Cal. 2015). However, information that would otherwise constitute record information can become content when it is the information the user communicates, rather than information automatically generated by a web browser. *In re Zynga Privacy Litig*., 750 F.3d at 1107.

Plaintiff alleges a violation of CIPA. The SAC alleges that Plaintiff input information on website forms that he intended to transmit to the merchant, such as IABMFG. SAC ¶¶ 1–2, 25-35,

58-60. That information was a communication intended for the merchant to instruct the merchant on how to process the payment and where to send the goods. Plaintiff alleges that the information was in transit to the merchant when Defendants intercepted the communication. *Id*. Defendants therefore intercepted a communication while it was in transit, in violation of § 631.

**1. *Defendants qualify as third-parties for liability under § 631.***

Defendants admit that they were not the intended recipient of Plaintiff's communications. ECF 51 at 14. Instead, Defendants rely on facts outside of the pleadings to argue that they were "not a third party to Plaintiff's communications." *Id*. However, there are no facts to support their conclusion that Shopify or Shopify USA is "an extension of IABMFG itself" that would excuse their wiretapping.

The one case Defendants rely upon to support their argument—*Graham v. Noom, Inc*., 533 F. Supp. 3d 823 (N.D. Cal. April 8, 2021)—is distinguishable. In *Noom*, the court found that a third party (FullStory) provided a service to the host-website (Noom) wherein it received data directly from Noom website users, stored that data on FullStory servers, and made the data available to Noom. *Id*. at 832. Notably, the court rested its conclusion that FullStory was "an extension of Noom" on the fact that FullStory did not separately use the data it collected, and instead made the data solely available to Noom. *Id*. Because of this critical fact, *Noom* concluded that FullStory was not a third party and therefore plaintiff failed to state a § 631 claim.

*Noom* also analyzed *Revitch v. New Moosejaw, LLC*, 2019 U.S. Dist. LEXIS 186955, at *4 (N.D. Cal. Oct. 23, 2019). There, the host-website (Moosejaw) embedded code from a third-party (NaviStone) that allowed NaviStone to collect data from the Moosejaw website users. *Id*. at *4. NaviStone then collected that data and merged it with other data to create a marketing database for its commercial use. *Id*. The *Revitch* court concluded that NaviStone was a third-party under § 631, stating "it cannot be that anyone who receives a direct signal escapes liability by becoming a party to the communication. Someone who presses up against a door to listen to a conversation is no less an eavesdropper just because the sound waves from the next room reach his ears directly." *Id.* Here, the facts align more with *Revitch* than *Noom* because Defendants collect the data, share the data with third parties like Stripe and MaxMind, create a profile of consumers across multiple

websites, and sell and use that data in ways independent of the host website, in this case IABMFG. As detailed in the SAC, for example, Defendants share the communications that they intercept with another undisclosed third-party, Stripe. SAC ¶ 6. To make matters worse, Stripe then rediscloses that information to other third-parties. *Id.* ¶ 46. The same is true of another third-party, MaxMind. *Id.* ¶ 47. Unlike *Noom*, Defendants do not collect and store the data for the sole use by IABMFG, but instead uses the data for their commercial purposes, making it a third-party under § 631.

**2. *Defendants intercepted the "contents" of communications.***

Defendants argue that they do not collect the "contents" of any communication as defined in the Wiretap Act, but instead only "record information."[7] *See* ECF 51 at 16. However, contrary to their argument, courts have not held that the types of information at issue here such as name, address, and credit card information, are categorically "record information." *See Campbell v. Facebook*, 315 F.R.D. 250, 265 (N.D. Cal. 2016) (holding that messages users sent that consisted of solely URLs qualify as "content"); *In re Vizio, Inc.*, 2017 U.S. Dist. LEXIS 224572, at *29–31 (C.D. Cal. July 25, 2017) (holding that the display of a user's computer screen is "content" because it was not generated in the course of communication); *In re Zynga Privacy Litig.*, 750 F.3d at 1107 (recognizing that where a user inputs personal information on a form on a website, that information is the "content" of a communication). Instead, the classification turns on how the information is generated and communicated.

Courts observe this distinction in cases finding that a defendant intercepts "contents"—not record information—when it intercepts a URL that contains search terms that a user inputted. Courts make this finding despite the fact that the URL is automatically generated. *See In re Pharmatrak*, 329 F.3d at 16, 18–19 (interception of URL that contained terms input by user into online form held to be violation of Wiretap Act); *In re Carrier IQ*, 78 F.Supp.3d at 1082 (URL that contained user's search terms held to be contents under Wiretap Act); *see also In re Zynga*, 750

[7] Defendants sow confusion by arguing that Plaintiff fails to state a claim under the first clause of section 631. *See* ECF 29 at 13–14; ECF 30 at 10–11. Plaintiff does not state a claim under the first clause, but as Defendants concede, section 631 applies to electronic communications under the second clause of 631(a), as discussed herein.

F.3d at 1107–08 (distinguishing between user's communication to a website and information automatically generated by a web browser).

*In re Zynga* analyzed whether a "referrer header" qualifies as "contents" under the relevant statutes. 750 F.3d at 1107–08. The "referrer header," which is essentially the URL underlying a link that is clicked, included a user's Facebook ID and the website from which the user clicked a link. *Id*. at 1107. Neither of these pieces of information were directly input by the user, but rather were automatically generated when the user clicked a link. *Id.* The court concluded the ID and website were not the "content" of the communication because "contents" of a communication "does not include record information regarding the characteristics of the message that is generated in the course of the communication." *Id*. at 1107 (emphasis added). In doing so, the court explained that the First Circuit in *In re Pharmatrak* "correctly held" that interception of information that users directly input into online forms was a violation of the Wiretap Act. *Id.*

Here, Plaintiff provided the information to IABMFG by inputting it directly into a form that Plaintiff intended to send to IABMFG. SAC ¶¶ 25-35, 57–60. Unlike "record information," which is associated with account creation, Plaintiff had the "communicative intent" to provide the contents of the communication for purposes of completing his order with the merchant. He communicated where to send the merchandise and which payment method to use. *Id*.

Defendants argue that the information is "record information" but misrepresent cases to state that certain types of information are categorically "record information," rather than contents of communications. *See* ECF 51 at 16. Courts have held that where an internet service provider discloses a consumer's account information, which may include name, address, phone number, etc., the information is "record information," and not "contents," under the Stored Communications Act. *See Svenson v. Google Inc*., 2015 U.S. Dist. LEXIS 43902, at *25–26 (N.D. Cal., April 1, 2015) (citing cases to support conclusion that user's account information was record information). In so holding, these cases rely on the explicit exception provided in the 18 U.S.C. § 2702(c) that allows web service providers (as defined in § 2702(a)) to "divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2))." However, that exception

does not apply here because it was not IABMFG sharing account information as may be permitted under § 2702(c), but rather a third-party directly intercepting information. Therefore, Plaintiff has alleged a violation of CIPA where Defendants directly intercepted the contents of Plaintiff's communications intended for merchants.

**E. Plaintiff States a Claim Under § 635.**

Section 635 provides that "[e]very person who … possesses … or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping … shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) …." Cal. Penal Code § 635 (emphasis added). Courts have likewise concluded that software or computer code constitutes a "device" under this statute. *See Revitch*, 2019 U.S. Dist. LEXIS 186955, at *7–8 (code is a device under § 635); *see also In re Carrier IQ, Inc., Privacy Litig*., 78 F.Supp.3d at 1084 (finding software to be a "device" under the Wiretap Act). Here, Plaintiff alleges that Defendants' computer code is a device that was "designed to intercept, collect, transmit, receive, track, analyze, and sell [] private information." SAC ¶ 80.

Defendants spend a lot of time applying statutory canons while ignoring case law that has already done the work. *See Revitch*, 2019 U.S. Dist. LEXIS 186955, at *7–8; *see also In re Carrier IQ, Inc., Privacy Litig*., 78 F.Supp.3d at 1084. Defendants' argument amounts to asking this Court to find that because software code did not exist at the time the statute was implemented in 1967, that the term "device" could not possibly apply to software code. *See* ECF 51 at 17. The California Supreme Court rejected such stunted thinking in *Apple Inc. v. Superior Court*, 56 Cal. 4th 128, 137 (2013) (ellipsis in original): "Fidelity to legislative intent does not make it impossible to apply a legal text to technologies that did not exist when the text was created. . . . Drafters of every era know that technological advances will proceed apace and that the rules they create will one day apply to all sorts of circumstances they could not possibly envision." Thus, the fact a technology did not exist at the time of a statute's enactment does not necessarily preclude the application of the statute to that technology. *See id*. at 139–41.

Looking to the plain language of the statute as Defendants purport to do, it is clear that the legislature intended CIPA to apply broadly and to evolve with advances in technology.

Specifically: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

In light of this intent, the California Supreme Court has instructed courts to interpret CIPA in a manner that "fulfills the legislative purpose of [CIPA] by giving greater protection to privacy interests." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002). Thus, when faced with two possible interpretations of CIPA, the California Supreme Court construed CIPA in accordance with the interpretation that provides the greatest privacy protection. *See Ribas v. Clark*, 38 Cal. 3d 355, 360–61 (1985). This Court, when applying California law, "must apply the law as it believes the California Supreme Court would apply it." *Kairy v. SuperShuttle Int'l*, 660 F.3d 1146, 1150 (9th Cir. 2011).

Finally, Defendants twist the words of the SAC to argue that "nothing in [the] allegations suggest the purpose to eavesdrop." ECF 51 at 19. However, Defendants' argument ignores the facts of the SAC and demands more than is required at the pleading stage. Plaintiff alleges that "Shopify's software code is designed to enable Shopify's computer network to intercept those communications and redirect them to Shopify's computer network." SAC ¶ 4. Taking the allegations as true, as is required at the pleading stage, Plaintiff has sufficiently alleged that the primary purpose of the software code is to intercept communications. *See also* SAC ¶¶ 25-35, 51–56, 60, 79-83.

Defendants argue that the purpose of its code, i.e. device, is to facilitate payments, not to eavesdrop. *See* ECF 51 19. What one does with a communication after it intercepts it does not change the fact that a device that is primarily designed to intercept communications is a device that is primarily designed to eavesdrop. *See* Blacks Law Dictionary (10th Ed. 2014) (defining eavesdropping as "a clandestine attempt to overhear or intercept others' private communication.") Undoubtedly, any eavesdropper plans to use the information it intercepts in some way, but that

does not change the purpose of the device. Defendants ignore the fact that in order to facilitate payments, it is eavesdropping on the communications between consumers and the merchant.

**F. Plaintiff States a Claim For Privacy Violations Under The California Constitution And California Common Law Intrusion Upon Seclusion.**

Claims for privacy violations under the California Constitution and common law intrusion upon seclusion consist of two key elements: (1) there must be "reasonable expectation of privacy", and (2) the intrusion must be "highly offensive." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606. *See also Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 285–97 (2009). The question of whether conduct is "highly offensive" is "an issue that cannot be resolved at the pleading stage." *Id*.

Defendants concede that Plaintiff alleges he had a reasonable expectation of privacy. Instead, Defendants argue that "the SAC has alleged no facts that mark Shopify Inc.'s conduct as being particularly egregious." ECF 51 at 21. However, Defendants jump the gun. The question of whether an intrusion is "highly offensive" is one that cannot be resolved at the pleading stage. *In re Facebook, Inc., Internet Tracking Litig*., 956 F.3d at 606 (stressing the uniquely subjective nature of the "highly offensive inquiry before concluding it "cannot be resolved at the pleading stage"); *Rodriguez v. Google LLC*, 2021 U.S. Dist. LEXIS 98074, *28 (N.D. Cal. May 21, 2021) ("[n]or is the offensiveness of Google's putative misconduct any less a matter of 'public policy,' or any more susceptible to 'resol[ution] at the pleading stage,' than that ascribed to Facebook"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019) ("[u]nder California law, courts must be reluctant to reach a conclusion at the pleading state about how offensive or serious the privacy intrusion is"); *Opperman v. Path, Inc*., 205 F. Supp. 3d 1064, 1078 (N.D. Cal. 2016) ("[t]he offensiveness inquiry is fact-specific"); *Revitch*, 2019 U.S. Dist. LEXIS at *9 ("a jury could conclude" that the intrusion into plaintiff's identity and browsing habits "is a highly offensive breach of norms"); *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1054 (N.D. Cal. 2018) (whether conduct rises to the level of highly offensive "is indeed a factual question best left for a jury").

In a bid to make this behavior seem more commonplace, Defendants argue that their interception and dissemination of data "happens on practically every website that offers goods or services in exchange for payments." ECF 51 at 21. However, "[t]he nature and volume of the collected information is also important." *Silver*, 2021 U.S. Dist. LEXIS 141090, at *18. While data from a single financial transaction may not strike a person as offensive, Defendants' ability to amass and synthesize data from a multitude of transactions is undoubtedly offensive. *See United States Dep't of Justice* v. *Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 764-65 (1989) (addressing "whether the compilation of otherwise hard-to-obtain information alters the privacy interest implicated by disclosure of that information," and describing congressional "recognition of the power of compilations to affect personal privacy that outstrips the combined power of bits of information contained within"); *Silver*, 2021 U.S. Dist. LEXIS 141090, at *18 (finding plaintiff stated claims for intrusion upon seclusion based on the aggregation of data).

### G. Plaintiff States a Claim Under § 502.

As explained in Plaintiff's Opposition to Shopify USA's MTD, the SAC adequately pleads a violation of Cal. Penal Code § 502 since Defendants knowingly accessed Plaintiff's data without permission. *See* Pl. Opp. Shop. USA Br. § IV(G). The same reasons apply here.

### H. Plaintiff States a Claim Under The UCL.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." (§ 17200.) The scope of the UCL is "broad." *Kasky v. Nike, Inc.*, 45 P.3d 243, 249 (Cal. 2002). Plaintiff has alleged claims under all three prongs, as explained in Plaintiff's Opposition to Shopify USA's MTD. *See* Pl. Opp. Shop. USA Br. § IV(H). For the same reasons, Plaintiff's claims under the UCL are not subject to dismissal.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Shopify Inc.'s Motion to Dismiss.

Dated: March 16, 2022

**GUTRIDE SAFIER LLP**

*/s/Seth Safier/s/*

SETH A. SAFIER (SBN 197427)
seth@gutridesafier.com
MARIE MCCRARY (SBN 262670)
marie@gutridesafier.com
TODD KENNEDY (SBN 250267)
todd@gutridesafier.com
HAYLEY REYNOLDS (SBN 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

KALI BACKER (admitted *pro hac vice*)
kali@gutridesafier.com
4450 Arapahoe Ave., Suite 100
Boulder, Colorado 80303
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*