GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Hayley Reynolds (State Bar No. 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Stephen M. Raab (admitted *pro hac vice*)
stephen@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| BRANDON BRISKIN on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SHOPIFY INC.; SHOPIFY (USA), INC.; and SHOPIFY PAYMENTS (USA), INC.,<br><br>Defendants. | CASE NO. 4:21-cv-06269-PJH<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT<br><br>Date: July 16, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Phyllis Hamilton |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

III. LEGAL STANDARD .......... 3

IV. ARGUMENT .......... 4

- A. Plaintiff Alleges That Shopify Engaged in Misconduct in 2019. .......... 4
- B. Plaintiff Alleges Shopify's Conduct Was Intentional. .......... 6
- C. Plaintiff Alleges that His Communications Were Intercepted "In Transit" Under § 631(A). .......... 11
- D. Plaintiff States a Claim for Privacy Violations Under the California Constitution and California Common Law Intrusion Upon Seclusion. .......... 14
- E. Plaintiff States a Claim Under CDAFA. .......... 17
- F. Plaintiff States a Claim Under the UCL. .......... 19
  - 1. Plaintiff Has Standing. .......... 19
  - 2. Shopify Engaged in Unlawful Conduct. .......... 21
  - 3. Shopify Violated the Fraud Prong. .......... 22
  - 4. Shopify Engaged in Unfair Conduct. .......... 23
- B. Plaintiff Requests Leave to Amend if Necessary. .......... 25

V. CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Cases**

*Ambriz v. Google, LLC*,
No. 23-cv-05437-RFL, 2025 U.S. Dist. LEXIS 29609 (N.D. Cal. Feb. 10, 2025) ..... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 3

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) ..... 21

*Briskin v. Shopify, Inc.*,
135 F.4th 739 (9th Cir. 2025) ..... passim

*Brown v. Brita Prods. Co.*,
No. 24-6678, 2026 U.S. App. LEXIS 10874 (9th Cir. Apr. 16, 2026) ..... 22

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) ..... 20

*Chabner v. United of Omaha Life Ins., Co.*,
225 F. 3d 1042 (9th Cir. 2000) ..... 22

*Collins v. eMachines, Inc.*,
202 Cal. App. 4th 249 (2011) ..... 22

*Daugherty v. Am. Honda Motor Co.*,
144 Cal. App. 4th 824 (2006) ..... 22

*Davis v. Facebook, Inc. ("In re Facebook Inc. Internet Tracking Litig.")*,
956 F.3d 589 (9th Cir. 2020) ..... 14, 15, 16, 17

*Doe v. Eating Recovery Ctr. LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ..... 13

*Doe v. GoodRx Holdings, Inc.*,
No. 23-cv-00501-AMO, 2025 LEXIS 229385 (N.D. Cal. July 22, 2025) ..... 9

*Doe v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) ..... 9

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ..... 8

*Doe v. Successfulmatch.com*,
70 F. Supp. 3d 1066 (N.D. Cal. 2014) ..... 23

*Drum v. San Fernando Valley Bar Ass'n*,
106 Cal. Rptr. 3d 46 (2010) ..... 23, 24

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ..... 24

*Friedman v. AARP, Inc.*,
855 F.3d 1047 (9th Cir. 2017) ..... 21

*Gabrielli v. Motorola Mobility LLC*,
No. 24-cv-09533-JST, 2025 LEXIS 273067 (N.D. Cal. July 14, 2025) ..... 10

*Garcia v. Truist Fin. Corp.*,
No. 2:25-cv-05753-MEMF-PVC, 2026 U.S. Dist. LEXIS 66374

(C.D. Cal. Mar. 25, 2026) ........ 7

*Gutierrez v. Converse Inc.*,
No. CV 23-6547-KK-MARx, 2024 U.S. Dist. LEXIS 124135
(C.D. Cal. July 12, 2024) ........ 12

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (Cal. 2009) ........ 14

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ........ 21

*In re Adobe Sys. Privacy Litig.*,
66 F. Supp. 3d 1197 (N.D. Cal. 2014) ........ 23

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ........ 22

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 15

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ........ 10, 25

*In re Google RTB Consumer Priv. Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) ........ 16

*In re Marriage of Evans*,
229 Cal. App. 4th 374 (2014) ........ 13

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........ 15

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) ........ 8, 19, 20

*In re Solara Medical Supplies, LLC Customer Data Security Breach Litigation*,
613 F. Supp. 3d 1284 (S.D. Cal. May 2020) ........ 20, 22

*Jones v. Tonal Sys.*,
751 F. Supp. 3d 1025 (S.D. Cal. 2024) ........ 13

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F. 3d 988 (9th Cir. 2018) ........ 9

*Klein v. Chevron U.S.A., Inc.*,
202 Cal. App. 4th 1342 (2012) ........ 21

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ........ 11

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) ........ 20

*Matera v. Google, Inc.*,
No. 15-CV-04062-LHK, 2016 U.S. Dist. LEXIS 107918
(N.D. Cal. August 12, 2016) ........ 24

*McClung v. AddShopper, Inc.*,
No. 23-cv-01996-VC, 2024 U.S. Dist. LEXIS 8725 (N.D. Cal. Jan. 17, 2024) ........ 17, 18, 20

*McCoy v. Alphabet, Inc.*,
No. 20-cv-05427-SVK, 2021 U.S. Dist. LEXIS 24180
(N.D. Cal. Feb. 2, 2021) ........ 25

*McKell v. Wash. Mut., Inc.*,
142 Cal. App. 4th 1457 (2006) ........ 24

*Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515 (2022) .......... 18, 19, 20

*Muha v. Experian Info. Sols., Inc.*, 106 Cal. App. 5th 199 (2024) .......... 18

*Naimi v. Starbucks Corp.*, 798 F. App'x 67 (9th Cir. 2019) .......... 21

*Opperman v. Path, Inc.*, 84 F. Supp. 3d 962 (N.D. Cal. 2015) .......... 10

*Pac. Steel Grp. v. Commer. Metals Co.*, 600 F. Supp. 3d 1056 (N.D. Cal. 2022) .......... 21

*R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876 (C.D. Cal. 2024) .......... 7

*Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075 (N.D. Cal. 2025) .......... 16

*Rodriguez v. Autotrader.com, Inc.*, No. 2:24-CV 08735-RGK-JC, 2025 U.S. Dist. LEXIS 70074 (C.D. Cal. April 4, 2025) .......... 6

*Rovai v. Select Portfolio Servicing, LLC*, No. 14-cv-1738-BAS-WVG, 2018 U.S. Dist. LEXIS 107764 (S.D. Cal. June 27, 2018) .......... 24

*Rubio v. Capital One Bank*, 613 F.3d 1195 (9th Cir.2010) .......... 19

*Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503 (C.D. Cal. 2021) .......... 13

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986) .......... 25

*Semien v. Pubmatic Inc.*, No. 25-cv-03164-SI, 2026 U.S. Dist. LEXIS 15196 (N.D. Cal. Jan. 27, 2026) .......... 11

*Silver v. Stripe Inc.*, No. 4:20-cv-08196-YGR, 2021 U.S. Dist. LEXIS 141090 (N.D. Cal. July 28, 2021) .......... 14

*Smith v. Google, LLC*, 735 F. Supp. 3d 1188 (N.D. Cal. 2024) .......... 8

*Smith v. Rack Room Shoes, Inc.*, No. 24-cv-06709-RFL, 2025 LEXIS 354693 (N.D. Cal. Aug. 4, 2025) .......... 17

*Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841 (N.D. Cal. 2022) .......... 20, 22

*Torres v. Prudential Fin., Inc.*, No. 22-cv-07465 (CRB), 2025 U.S. Dist. LEXIS 73736 (N.D. Cal. Apr. 17, 2025) .......... 13

*Toy v. Life Line Screening of Am. Ltd.*, No. 23-cv-04651-RFL, 2024 U.S. Dist. LEXIS 88872 (N.D. Cal. Mar. 19, 2024) .......... 12

*United States Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749 (1989) .......... 16

*Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987) .......... 4

*Valenzuela v. Keurig Green Mt., Inc.*,
674 F. Supp. 3d 751 (N.D. Cal. 2023) .......... 13

*Yockey v. Salesforce, Inc.*,
745 F. Supp. 3d 945 (N.D. Cal. 2024) .......... 11

**Statutes**

Cal. Bus. & Prof. Code § 22575(a) .......... 21

Cal. Civ. Code § 1798.140 .......... 16

Cal. Civ. Code § 3426.7(b) .......... 19

Cal. Penal Code § 631(a) .......... 3, 11, 13

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 3

Fed. R. Civ. P. 8 .......... 5

## I. INTRODUCTION

In its latest motion to dismiss, Shopify once again resorts to mischaracterizations of Plaintiff's allegations to try to escape this lawsuit. This Court granted Shopify's prior motion to dismiss on *three* narrow grounds, providing Plaintiff leave to add allegations supporting inferences that: (1) Shopify wrongfully obtained his data in 2019; (2) Shopify did so intentionally; and (3) Shopify intercepted Plaintiff's data "in transit." Plaintiff included numerous allegations to address each of these issues in his Third Amended Complaint ("TAC").

With its head firmly in the sand, Shopify contends that Plaintiff has no basis whatsoever for alleging that Shopify intercepted and used his data in 2019—even though Shopify's own documents from 2019 confirm that it did so. Shopify similarly contends that Plaintiff has failed to allege Shopify intentionally took Plaintiff's information without his consent, even though Plaintiff alleges that Shopify controlled the relevant website and thus knew that neither it nor the merchant had obtained Plaintiff's consent. And Shopify argues that it could not possibly have attempted to learn the contents of Plaintiff's communications "in transit," because any communication must necessarily be received before being read. Under that theory, no one would ever violate CIPA.

Shopify also recycles the arguments the Court rejected on Shopify's last motion, hoping repetition will do the trick. Shopify pretends Plaintiff's claims are simply about Shopify's undisclosed role as a payment processor, disregarding the breadth of the tracking alleged and the case law confirming that the mass accumulation and use of consumer data constitutes an invasion of privacy. Shopify then incorrectly contends that Plaintiff fails to allege damages under California's Comprehensive Computer Data Access and Fraud Act ("CDAFA") and Unfair Competition Law ("UCL"). The CDAFA allows for a disgorgement of profits remedy, and courts have long-held that a plaintiff may recover benefit-of-the-bargain damages, which is precisely what Plaintiff seeks here. He explicitly alleges that he would not have purchased items from IABMFG had he known of Shopify's interception and tracking, and, thus, he lost money as a direct result. Plaintiff also plausibly alleges claims for all three types of Unfair Competition Law (UCL) claims.

Defendants' fourth motion to dismiss must be denied.

## II. BACKGROUND

Shopify operates an e-commerce platform that hosts or integrates directly into its merchants' websites. ECF No. 97 ("TAC") ¶ 1. To consumers, the webpages appear to belong entirely to the merchant—there is no Shopify branding, disclosure, or other indication that Shopify is involved. *Id.* ¶¶ 4, 26. Consumers, therefore, reasonably believe they are communicating only with the merchant. *Id*. They are not.

In reality, Shopify uses its platform to collect vast amounts of consumer data for its own benefit. *Id*. ¶¶ 2–6. What appears to consumers as a routine checkout process is, in fact, a system for data monetization and brokering. Shopify—not the merchant—deploys code to consumers' devices that generates the payment form and surreptitiously routes every piece of information entered—names, shipping addresses, credit-card number and CVC, IP addresses, geolocation data, and the items purchased—directly to Shopify's servers. *Id.* ¶¶ 2, 25–34, 94. Shopify also installs cookies on users' browsers that track consumers' transactions across the Shopify merchant network. *Id*. ¶¶ 5, 49–52. Shopify aggregates the extracted data to build detailed profiles, which it markets as a risk analysis to its merchants. *Id.* ¶ 54–56. These profiles are based on cross-site information available only to Shopify—such as whether a consumer's order resembles past transactions, whether addresses match, or whether the IP location aligns with the shipping destination. *Id*. Shopify's profiling has real-world consequences for consumers: Shopify merchants can preemptively block or cancel any transaction flagged as "high risk." *Id*. ¶ 56. Shopify further shares the intercepted data with third parties engaged in similar profiling. *Id.* ¶¶ 57–58. Shopify knows that consumers have not consented to any of this. *Id.* ¶¶ 59, 62–67.

Plaintiff Briskin is a consumer who was subjected to Shopify's undisclosed data collection and use. When Briskin bought an item from the IABMFG website in 2019, he had no reason to know that IABMFG was a merchant on the Shopify platform, that Shopify was involved in the transaction, or that Shopify would intercept and use his information. *Id.* ¶¶ 68–79. The IABMFG website did not disclose Shopify's involvement, and Briskin never consented to Shopify's

collection, storage, or use of his personal data. *Id*. However, like all other users who made a purchase on the IABMFG website, Shopify installed tracking cookies, collected his sensitive financial information, and used it to profile him. *Id*. Briskin would not have bought the items on IABMFG had he known it would enable Shopify to track his behavior, disseminate his private information, and generate a risk profile based on his transaction history. *Id*. Briskin did not discover Shopify's conduct until 2021. *Id*. ¶ 79.

This is Defendants' fourth motion to dismiss. The Court previously granted Shopify's third motion to dismiss on three grounds, with leave to amend as to each. First, as to all of the claims, the Court found Plaintiff did not provide "adequate factual support that the conduct disclosed in 2021 actually took place in 2019 as well." *See* ECF 95 at 5–6. Second, as to four of the claims, the Court found Plaintiff failed to sufficiently allege Shopify's intent because (a) a provision of Shopify's own privacy policy states that merchants agree to obtain consent from their customers for the use and access of their personal information by Shopify and others; and (b) the SAC alleged only that IABMFG did not obtain proper consent, not that *Shopify* knew that IABMFG did not obtain users' consent and thus that Shopify intended to obtain Plaintiff's data without his consent. ECF No. 95 at 7–8 ("plaintiff's § 631(a) claim fails to adequately allege that defendants acted with the requisite intent to violate the statute"), 9 ("plaintiff's claims for invasion of privacy and intrusion upon seclusion fail to adequately allege that defendants acted with the requisite intent to violate the law"), 10 ("because Shopify's policies required merchants to obtain consent for Shopify's access, plaintiff's CDAFA claim fails to adequately allege that defendants acted with the requisite intent to violate the law"). Third, the Court granted the motion to dismiss the CIPA 631(a) claim on the grounds that "the complaint does not adequately allege that the contents of the communications were read 'in transit,' . . . with leave to amend." *Id.* at 12.

As set forth above and below, the TAC addresses each of those issues.

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must accept all factual allegations as true and draw all reasonable inferences in favor of the

plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). This is not akin to a "probability requirement." *Id.*

## IV. ARGUMENT

### A. Plaintiff Alleges That Shopify Engaged in Misconduct in 2019.

Plaintiff plainly alleges that "Shopify regularly intercepted, read, and used information from consumers who made purchases on the IABMFG websites in 2019, including in June 2019 when Plaintiff made a purchase on what he believed to be the IABMFG website." TAC ¶ 37. Despite Defendants' argument that this allegation is "pure speculation" (ECF No. 101 ("MTD") at 14.[1]), the TAC includes *multiple* additional factual allegations supporting this allegation. *See* TAC ¶¶ 43–44. First, the html code associated with the 2019 email receipt he received, and of IABMFG webpages, confirm that Shopify controlled the IABMFG web pages and functionality in 2019. TAC ¶¶ 35, 36. Second, Shopify itself admitted in 2019 that it collected "our merchants' customers' name, email, shipping and billing address, payment details, company name, phone number, IP address, information about orders you initiate, information about the Shopify-supported merchant stores that you visit, and information about the device and browser you use" and that it does so when such users "use or access a store that uses our Services." *Id.* ¶ 44. Shopify further admitted that it used such personal data both for its own purposes and for the benefit of third parties, including to present "goods and service that are more likely to be of interest to [such users]," "to conduct some level of automated decision-making," to support the efforts of "a variety of third parties and service providers," "to serve targeted ads from Google, Facebook, Bing, SourceKnowledge, and other third-party vendors;" and "to provide you with personalized advertising, ad delivery, and reporting across multiple sessions and devices." *Id.*

In addition to identifying these direct admission by Shopify concerning its conduct in 2019, Plaintiff further supports his claims by alleging that "in 2019, Shopify used tools such as Apache Kafka, Apache Beam, and internally-built tools such as Monorail, to read, process, categorize,

[1] Citations to pleadings on the docket use the ECF page numbering at the top of the pages.

stream, and act upon user communications;" and that "[p]osts on Shopify's engineering blog (located at shopify.engineering) confirm Shopify's use of the code referenced above in 2019 and thereafter, confirm that Shopify processed event data prior to storage and prior to providing event data to the merchant, and confirm that Shopify analyzed and retained consumers' personal information, including their address information and purchase history." TAC ¶¶ 43–44.

These allegations completely refute Shopify's argument that the TAC does not satisfy Rule 8 because it "fails to plausibly show that Shopify's alleged misconduct occurred at the time of [Plaintiff's] 2019 purchase." MTD at 12. Shopify emphasizes the gap between the date of Plaintiff's purchase in 2019 and the date of the discovery of Shopify's data practices in 2021, and then mendaciously suggests (a) that Plaintiff is merely speculating, without any basis whatsoever, as to whether his data was intercepted, collected, and used in 2019 (despite Shopify's own admissions that it did so as a matter of course in 2019), and (b) that Plaintiff supposedly does not allege that Shopify's data collection practices in June 2019 and April 2021 were the same in the relevant respects (implying that Plaintiff does not allege—although he clearly does—that Shopify collected and used data obtained as consumers visited and used the websites of Shopify merchants in 2019). MTD at 7. Given the allegations described above, these contentions are blatantly false.

Defendants also argue that Plaintiff does not detail the IABMFG 2019 privacy policy. But this is a red herring. The IABMFG privacy policy is not an element of Plaintiff's claims; and he does not allege that he read or relied on it. A technical review of the latent source code associated with that privacy policy does, however, further confirm that Shopify operated the IABMFG website in 2019, which supports Plaintiff's allegations that Shopify operated the website and engaged in misconduct in 2019. TAC ¶ 36 (alleging that an analysis of the 2019 version of the IABMFG privacy policy webpage, among other pages, "reveal[s] that IABMFG used Shopify to operate its checkout processes and storefronts").

Lastly, to the extent that Defendants suggest that Plaintiff must allege more precisely, in exacting details, how Defendants obtained and used his specific data at the time Plaintiff used the IABMFG website in 2019, that would essentially require any would-be Plaintiff (1) to record his network activity all the time, *expecting* Defendants to disregard his privacy elections; and (2) to

have access to a level of detail about Defendants' software architecture and practices that is simply not realistic (and certainly not required under Rule 8). Defendants' proposed standard would be a *de facto* bar to all internet privacy cases. Moreover, it would open any plaintiffs who survive a motion to dismiss to an attack on their Article III standing, as they would be *expecting* that their privacy rights would be infringed upon. *See Rodriguez v. Autotrader.com, Inc.*, No. 2:24-CV 08735-RGK-JC, 2025 U.S. Dist. LEXIS 70074, at *1-3 (C.D. Cal. Apr. 4, 2025) (no Article III standing when a "tester" expected to be harmed by privacy violations).

In sum, the TAC puts Defendants on notice of the claims asserted against them, and provides sufficient factual allegations to make those claims plausible.

**B. Plaintiff Alleges Shopify's Conduct Was Intentional.**

Although Plaintiff is permitted to plead intent generally, he specifically alleges that Shopify knew that IABMFG did not obtain Plaintiff's or other users' consent to the transmission of their data to Shopify *for its own use and the use of third parties* and that Shopify intended to access and use Plaintiff's data despite his lack of consent.[2]

As set forth above, Plaintiff alleges that Shopify controlled the IABMFG web pages and functionality. TAC ¶¶ 35 ("[t]he IABMFG websites used Shopify for data services . . . in 2019"), 36 ("IABMFG used Shopify to operate its checkout processes and storefronts"), 65 (Shopify operated and controlled the IABMFG checkout pages in 2019). Given how many websites (or stores) it hosts and operates, Shopify has extensive data on what pages users visit and whether merchants require agreement to terms. *Id.* ¶ 67. "Shopify gives its merchants the option to require assent to the merchants' own terms before a customer can complete an order, but Shopify did not and does not provide an option to require customers to specifically agree to Shopify's access and use of the customers' information in order for a customer to complete a checkout." *Id.* Providing users with sufficiently conspicuous notice of the data Shopify obtains and how it uses and shares it, and actually requiring their consent, would be against Shopify's economic interests. *Id.*

[2] Shopify continues to mischaracterize this case as if it is just about ordinary payment processing, but Plaintiff's claims are not based merely on Shopify's role as a payment processor. Rather, as the Ninth Circuit explained, Plaintiff alleges Shopify exploited its roles as website host and data processor "to obtain valuable personal data about California consumers for its own commercial gain." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 756 (9th Cir. 2025).

Accordingly, Shopify designed the webpages it hosted (including the IABMFG webpages) such that Shopify did not give the merchant the option to obtain such consent. *id.* ¶¶ 67 ("Shopify intentionally did not want to inform customers of what it was doing and did not want to directly ask for their consent, so Shopify designed, managed, and operated a checkout platform that did not even allow the merchant to require specific assent to Shopify's access to and use of customers' information."); 73 ("Shopify (as the controller of the checkout platform) could provide a conspicuous disclosure and require customers to assent to Shopify's access and use of their information, but it intentionally has chosen not to do so."). In sum, given its operation of and control over the IABMFG website, Shopify knew that the website did not disclose Shopify's access to and use of user data or require Plaintiff's consent to that usage (for Shopify's benefit and the benefit of third parties). *Id.* ¶¶ 65, 66. Plaintiff further alleges that Shopify intentionally did not enforce the language in its privacy policy about obtaining users' consent. *Id.* ¶¶ 66–67.

Knowing that it did not have Plaintiff's or other consumers' consent, Shopify nonetheless intercepted, processed, collected, and used their personal information on payment forms designed, controlled, and processed by Shopify, and "surreptitiously install[ed] tracking cookies on consumers' computers and mobile devices, which enable Shopify to identify a particular consumer and track his or her activities across its entire merchant network, enabling Shopify to gather even more sensitive data about the consumer." *Id.* ¶¶ 2–7; *see also id.* ¶¶ 37–45, 53–55, 59, 62–67. These allegations are more than sufficient to allege Shopify engaged in "intentional act[s], which Shopify knows will cause harm to California consumers by violating the very laws that the California legislature has enacted to protect California consumers' rights to data privacy and security, and from unfair business practice." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 756 (9th Cir. 2025) (noting this was Shopify's alleged business model); *see also Garcia v. Truist Fin. Corp.*, No. 2:25-cv-05753-MEMF-PVC, 2026 U.S. Dist. LEXIS 66374, at *26–27 (C.D. Cal. Mar. 25, 2026) (allegation that the defendant chose to integrate and embed a third party's tracking code on its website is sufficient to allege an intentional act); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024) (plaintiffs sufficiently alleged intent for purposes of CIPA and other claims where they alleged defendant "intentionally utilized tracking technologies to collect, use,

and distribute Plaintiffs' sensitive information to third parties like Facebook," by configuring "the Pixels to capture the 'characteristics' of users' communications with Defendant's websites").

In response to these robust allegations, Shopify points to its own privacy policy, which states that merchants "agree to obtain consent from [their] customers for the use and access of their personal information by Shopify and other third parties." MTD at 15–16. But Shopify cannot negate Plaintiff's allegations simply by pointing to some generic policy language purporting to establish Defendants' intent to comply with the law. *See Smith v. Google, LLC*, 735 F. Supp. 3d 1188, 1198 (N.D. Cal. 2024) (plaintiff adequately alleged intent for purposes of a CIPA claim by alleging that Google did not enforce its supposed policies prohibiting customers from sending personal information to Google, and that Google knew of or, at best, turned a blind eye to the use of its tools to collect users' valuable information). Another case even more clearly illustrates the point. *See Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1075–76 (N.D. Cal. 2023) (plaintiffs sufficiently alleged intent despite defendant's contention that its written policy and the role of third parties negated intent).

In *Doe*, the plaintiffs alleged that the Meta Pixel was "designed for the very purpose of intercepting communications on third-party websites by surreptitiously and contemporaneously redirecting these communications to Meta." *Id.* at 1075. In seeking to dismiss the claims, Meta (like Shopify) argued that its intent could not be established because third-parties, not Meta, choose whether to install the Pixel and those parties were responsible for the information sent to Meta. *Id.* at 1076. Meta (like Shopify) also argued that it had a policy (contractually forbidding developers from sending the type of sensitive data at issue) that defeated plaintiffs' allegations of intent. *Id.* The court rejected Meta's arguments, finding plaintiffs satisfied their pleading burden by alleging Meta did not truly intend to stop the exchange of sensitive data or fully implement its purported policy, and that Meta's tools and filters were not effective. *Id.* This Court should reject Shopify's motion for the same reasons. The mere existence of a written policy is insufficient to establish the absence of intent as a matter of law. *See id.*; *see also In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1003 (N.D. Cal. 2024) ("Whatever agreements may have been in place, those agreements do not establish as a matter of law that Meta did not intend to receive the

information plaintiffs claim was transmitted."); *accord Doe v. GoodRx Holdings, Inc.*, No. 23-cv-00501-AMO, 2025 LEXIS 229385, at *23–24 (N.D. Cal. July 22, 2025).[3]

Shopify next argues that its control of the checkout process is not conclusive because "merchants have a variety of methods to notify users of policies and practices, from placing conspicuous hyperlinks in notification emails or on the home page," and thus Plaintiff's allegations are insufficient to support an inference of intent. MTD at 15. First, Plaintiff alleges that Shopify operated the IABMFG storefront (not just the checkout cart), but Plaintiff appropriately focused on the checkout process as the place where Plaintiff entered personal information, where merchants typically present terms, and where Shopify itself afforded merchants (such as IABMFG) with the option to require assent to the merchants' own terms but did not provide an option to require customers to specifically agree to Shopify's access and use of the customers' information. Second, Plaintiff's allegations do not need to foreclose all potential disputes or arguments. Plaintiff has alleged enough to support an inference, which must be drawn in his favor, that Shopify knew that Plaintiff had *not* consented to Shopify's access to and use of his data for Shopify's own purposes and for the benefit of third parties. That is all that is required.

At this stage, Plaintiff's claims cannot be defeated by Defendants' own "pure speculation" about what IABMFG could *theoretically* have done through a hypothetical pop-up window (which Shopify knows IABMFG did not use to obtain Plaintiff's consent)[4] or through a post-transaction confirmation email (which (a) arrived after the wrong had been done, (b) did not expressly reveal what Shopify did with Plaintiff's data or even expressly indicate Shopify's involvement at all, and (c) revealed Shopify's involvement only through a later technical analysis

---

[3] Shopify's reliance on *Doe v. Google LLC*, 741 F. Supp. 3d 828 (N.D. Cal. 2024) is misplaced. In that case, Google did not control the websites at issue, the plaintiffs did not allege how their health information was intercepted, and they acknowledged Google repeatedly told developers not to send PII. *Id.* at 840–41. Indeed, although Shopify asks the Court to take judicial notice of its Privacy Policy, the Court cannot judicially notice Shopify's *intent*, which is plainly an issue of disputed fact. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F. 3d 988, 999 (9th Cir. 2018) (explaining that "[a] court may take judicial notice of matters of public record" but "a court cannot take judicial notice of disputed facts contained in such public records.")

[4] Indeed, if there had been an option on the IABMFG website for Plaintiff to specifically provide consent to Shopify access to and use of his information, Shopify would have received the response to that option, given its role as the host and processor for the website.

of its html code). Shopify cannot override Plaintiff's allegations by feigning ignorance or pretending there is some mystery as to whether Plaintiff consented or not. Plaintiff's allegations are clear: Shopify knew, and knows now, that there was no such consent.

Shopify argues that, sometime after Plaintiff's 2019 purchase, IABMFG began complying with Shopify's supposed "policy" of obtaining consumer consent when IABMFG posted a version of a privacy policy that expressly refers to Shopify. But this once again mischaracterizes Plaintiff's allegations and reality. Plaintiff alleges that this revised version of the IABMFG privacy policy was "inconspicuous and dormant," and clearly posted in a way to avoid calling it to customers' attention and without requiring their assent to it. Far from showing that Shopify's supposed policy (of requiring consent) was genuine and sincere, it shows the opposite.

Shopify also emphasizes that its default template for certain webpages includes a statement "powered by Shopify," supposedly showing that its role was not intended to be secret. MTD at 17. But that statement does not come close to notifying consumers that Shopify will take swaths of detailed and sensitive information about them as they shop and use that information for its own benefit and the benefit of many third parties, including to create profiles for those users.

Intent turns on whether the defendant purposefully engaged in conduct that intercepted communications. *See Gabrielli v. Motorola Mobility LLC*, No. 24-cv-09533-JST, 2025 LEXIS 273067, at *29 (N.D. Cal. July 14, 2025) (rejecting that the interception was due to a "bona fide error" and not intentional since the complaint alleged "that Motorola intentionally operated its website and assisted third parties in collecting Gabrielli's information.") And, that is a factual question. *Id*. For this reason, "interceptions may be considered intentional where a defendant is aware of the defect causing interception and takes no remedial action." *In re Google Assistant Privacy Litig*., 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020). In any event, "even for fraud-based claims, which are subject to the Rule 9(b) heightened pleading standard, scienter allegations may be pleaded generally." *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 986 (N.D. Cal. 2015). Plaintiff certainly satisfies that standard.

### C. Plaintiff Alleges that His Communications Were Intercepted "In Transit" Under § 631(A).

A CIPA violation occurs if anyone "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." Cal. Penal Code § 631(a). The "in transit" element is satisfied when it is alleged that the defendant accessed or received messages "before or simultaneously with" the intended recipient or before the data was committed to storage. *See Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 952–53 (N.D. Cal. 2024); *see also Ambriz v. Google, LLC*, No. 23-cv-05437-RFL, 2025 U.S. Dist. LEXIS 29609, at *12–13 (N.D. Cal. Feb. 10, 2025) ("in transit" means "either before or simultaneously with the intended recipient"). Alternatively, courts have equated the "in transit" element to "acquisition contemporaneous with transmission." *See Semien v. Pubmatic Inc.*, No. 25-cv-03164-SI, 2026 U.S. Dist. LEXIS 15196, at *21 (N.D. Cal. Jan. 27, 2026) (finding plaintiffs plausibly alleged real-time interception, and concluding factual disputes about whether the defendant actually intercepted communications in transit were not appropriately resolved on a motion to dismiss) (quoting *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002)).

Plaintiff readily satisfies this element of his CIPA claim. He alleges that Shopify attempted to learn the contents or meaning of his communications while they were being sent from his device in California and while those communications were in transit, before they reached either the intended recipient (IABMFG) or storage. TAC ¶¶ 39 (Shopify has "systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is transformed and committed to storage and before the data reaches merchants, such as IABMFG."), 43 ("Shopify employed real-time stream processing platforms specifically designed to operate on data 'in flight'—that is, after the initiation of the transmission by a user's action in a browser but before the data is committed to ultimate storage and before a version of the event data is sent or published to merchants, such as IABMFG, or transmitted to a payments provider, such as Stripe."). Plaintiff further identifies the specific tools Shopify used "to read, transform, categorize, analyze, and act upon data streams as they are received." *Id.* ¶ 43. "Posts on Shopify's engineering blog (located at shopify.engineering) confirm Shopify's use of the code

referenced above in 2019 and thereafter, confirm that Shopify processed event data prior to storage and prior to providing event data to the merchant . . . ." *Id.* ¶ 44. Shopify itself admitted that it collected such information "*when* you use or access a store that uses our Services, such as *when* you visit a merchant's site." *Id.* ¶ 44 (emphasis added). The TAC also provides screenshots showing exactly when and how the data is transmitted. *See* SAC ¶¶25–40; *see Toy v. Life Line Screening of Am. Ltd.*, No. 23-cv-04651-RFL, 2024 U.S. Dist. LEXIS 88872, at *3 (N.D. Cal. Mar. 19, 2024) (finding the "in transit" element satisfied when the complaint offered detailed allegations about how Meta Pixel worked).

In response, Shopify advances three specious arguments.

First, Shopify argues that Plaintiff alleges that *all* of his data was encrypted, and thus could not be read in transit. MTD at 18–20 (citing *Gutierrez v. Converse Inc.*, No. CV 23-6547-KK-MARx, 2024 U.S. Dist. LEXIS 124135, at *19 (C.D. Cal. July 12, 2024) (granting summary judgment where there was no evidence Salesforce had access to the content of the chats at issue)). But Shopify again mischaracterizes Plaintiff's allegations. Plaintiff alleges that only the contents *of certain cookies* are encrypted. TAC ¶ 51. Nothing in the TAC alleges that data transmitted through the payment forms was encrypted. Indeed, that data could *not* have been encrypted since the TAC features a screenshot of the payload which is *unencrypted*. *Id*. ¶¶ 33–34. Plaintiff also alleges that, in 2019, he *believed* he was sending data over an encrypted connection *directly* to IABMFG. But he also alleges that believe turned out to be mistaken and that his data was actually going to Shopify before reaching IABMFG. Thus, even if certain data were encrypted in transit to Shopify, Shopify's processing and use of that data before or at the same time the corresponding data reaches the intended recipient (IABMFG) would still satisfy the "in transit" element.

Second, Shopify argues that it could not have attempted to learn the contents or meaning of Plaintiff's communications until after it had received them, and that once it received them, they were no longer "in transit." MTD at 11–12. That theory ignores the distinction between the intended recipient and the intercepting party, and it ultimately seeks to nullify CIPA's second clause entirely. Anyone who intercepted a communication could avoid liability on the theory that they could only attempt to read or learn the contents after receiving it, at which point there is no

longer any violation. *See Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021) (rejecting an interpretation that would vitiate CIPA's protections) (citing *In re Marriage of Evans*, 229 Cal. App. 4th 374, 381 (2014) (explaining "a court must select the construction that comports most closely with the apparent intent of the Legislature, in order to promote, rather than to frustrate the purpose of the statute, and to avoid an interpretation that would lead to absurd consequences") (internal quotation marks omitted)). The cases cited by Shopify either fail to give this aspect of 631(a) meaning or are distinguishable. *See Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1117 (N.D. Cal. 2025) (noting that "the only commonsense meaning of transit, at least in the context of this statute, is the transit from the person sending the communication to its intended recipient" but finding Meta's filtering occurred after the intended recipient (the website operator) had received the communication); *Torres v. Prudential Fin., Inc.*, No. 22-cv-07465 (CRB), 2025 U.S. Dist. LEXIS 73736, at *15 (N.D. Cal. Apr. 17, 2025) (deciding a summary judgment motion and failing to find anything in the record indicating an attempt to read the contents of communications); *Valenzuela v. Keurig Green Mt., Inc.*, 674 F. Supp. 3d 751, 758 (N.D. Cal. 2023) (complaint provided no detail as to how the interception occurs); *Jones v. Tonal Sys.*, 751 F. Supp. 3d 1025, 1037 (S.D. Cal. 2024) (vendor did not use data for its own purpose and its server was the intended destination for the communication, so there was no interception).

Third, Shopify argues that certain types of filtering and processing of data might not, by themselves, constitute "reading" the contents of the communications. But Plaintiff alleges that Shopify read, analyzed, and processed his communications in a variety of ways as the information moved through data pipelines, including to interpret his data, associate his data with a particular cart and user, "to construct, enrich, or distribute event data," and to determine what actions to take based on the data included in the communications, including where to send it along or distribute it, "in real time, as the data is transmitted over the network." *Id.* ¶¶ 39–43, 71. Shopify did so to immediately understand and begin exploiting his data for Shopify's own purposes and to share with third parties. *Id.* ¶¶ 2–7, 17, 33, 34, 39–44, 57, 94, 97. These allegations are sufficient to allege that Shopify attempted to read or learn the contents or meaning of Plaintiff's communications while in transit. Indeed, as the Ninth Circuit noted, receiving and using the

content of Plaintiff's data in real time is Shopify's business model. *See Briskin*, 135 F.4th at 755–56 ("As a part of its regular course of business, Shopify is alleged to target California consumers to extract, collect, maintain, distribute, and exploit for its own profit, not only the California consumers' payment information that it diverts to its own servers, but also all of the other personal identifying information that it extracts from the software it permanently installs on their devices without their knowledge or consent. Thus, Shopify's business model is to perform the payment processing services it contracts to provide for its merchants and, in the course of doing so, to obtain valuable personal data about California consumers for its own commercial gain.").

### D. Plaintiff States a Claim for Privacy Violations Under the California Constitution and California Common Law Intrusion Upon Seclusion.

Shopify acknowledges that this Court has already rejected its argument that Plaintiff alleges only "routine commercial behavior" (ECF No. 95 at 13), but still seeks reconsideration of that holding. MTD at 20–23. Yet again, there is no merit to Shopify's argument.

Claims for privacy violations under the California Constitution and common law intrusion upon seclusion have two key elements: (1) there must be "reasonable expectation of privacy", and (2) the intrusion must be "highly offensive." *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020). Surreptitious or broad collection of online data, such as that alleged here, is actionable. *See Silver v. Stripe Inc.*, No. 4:20-cv-08196-YGR, 2021 U.S. Dist. LEXIS 141090, at *18 (N.D. Cal. July 28, 2021) (denying a motion to dismiss claims for invasion of privacy and intrusion upon seclusion where plaintiffs alleged that "Stripe collected comprehensive information relating to plaintiffs' web browsing histories, financial information, device information, and online purchase activities," and then compiled the information into reports, assigned risk scores, and made the information available to all of Stripe's merchants). In determining whether an invasion is "highly offensive," courts consider "the degree and setting of the intrusion," along with "the intruder's motives and objectives." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (Cal. 2009). Due to the fact-intensive nature of the inquiry, courts are "reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is." *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 797

(N.D. Cal. 2019); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 799 (N.D. Cal. 2022) (explaining courts are "hesitant" to decide such issues on the pleadings); ECF No. 95 at 13 (noting "courts are reluctant to conclude, at the pleading stage, that conduct was 'highly offensive'"). Accordingly, the ultimate question of whether Shopify's tracking and collection practices "could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage." *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 606.

Shopify first argues that Plaintiff created "an unmendable hole" by identifying the relevant admissions Shopify made about its conduct in its 2019 privacy policy. MTD at 20–21. This is pure nonsense. Shopify's privacy policy was never presented to Plaintiff and he had no reason to look for it; because Shopify actively concealed its role and activities, he did not even know Shopify was involved in his 2019 transaction until years later. TAC ¶¶ 45, 62–67, 70–79. Plaintiff alleges that users would not reasonably expect that an unknown third-party, such as Shopify, would collect payment and purchase data on the IABMFG website and beyond, use that data to build consumer profiles and assess users' credit-worthiness, and share that data with other third-parties. He plausibly alleges that such conduct was highly offensive.

Shopify next repeats arguments that this Court and the Ninth Circuit have already rejected, including the pretense that all it did was collect purchase information to facilitate online payment processing. But, as the Ninth Circuit explained, Defendants' involvement "neither begins nor ends with the completed transaction." *Briskin*, 135 F. 4th at 747. From the moment consumers view a product, Shopify installs tracking cookies that monitor their behavior across its vast merchant network. *Id.* at 747–748. When a purchase occurs, Shopify not only processes payment data but also collects detailed order information, including the items purchased. TAC ¶¶ 2, 25–33, 94**.** It repackages this data into consumer profiles, assigns "risk scores" that merchants use to block or cancel transactions, and shares the data with third parties such as Stripe, which build and sell their own "risk insights," all while the tracking continues across Shopify's vast merchant network so it can collect even more data to further enrich those profiles. *Id.* ¶¶ 49–52, 57–58. In sum, Plaintiff alleges that "Shopify surreptitiously implanted cookies that permanently remained on Briskin's device, tracked its physical location, and collected data regarding Briskin's online shopping

activity," and then "used the resulting data to compile a consumer profile that Shopify marketed widely, including to many California merchants." *Briskin*, 135 F.4th at 746. In doing so, Shopify engages in "intentional act[s], which Shopify knows will cause harm to California consumers by violating the very laws that the California legislature has enacted to protect California consumers' rights to data privacy and security, and from unfair business practice." *Id.* at 756. Shopify's alleged conduct bears no resemblance to routine payment processing.

Shopify argues that the type of information at issue is not sensitive; and that Shopify uses the information for salutary purposes. Not so. The information that Shopify collected and shared here is "personal information under California law and parties generally maintain a reasonable expectation in their personal information." *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 946–47 (N.D. Cal. 2022) (citing Cal. Civ. Code § 1798.140 (personal information includes "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement")); *see also In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 604 (finding reasonable expectation of privacy in browsing history and when Facebook created "highly personalized profiles" of the plaintiffs based on the data collected).

That amassing of data and subsequent use of it is especially critical. While data from a single financial transaction may not strike a person as offensive, Defendants' ability to amass and synthesize data from a multitude of transactions "outstrips the combined power of bits of information contained within." *See United States Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 764–65 (1989). As such, courts recognize that the mass *accumulation* of online data is highly offensive and invades users' reasonable expectation of privacy, regardless of the specific type and quality. *See Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1088 (N.D. Cal. 2025) (rejecting argument that the plaintiffs did not have a "reasonable expectation of privacy" or that the conduct was "highly offensive" based on the "alleged aggregation, synthesis, and sale of comprehensive online and offline data of individuals without their knowledge"). The scale of what took place here cannot be understated. Shopify's tracking takes place *across the internet*, in *every website* under its vast merchant network,

*regardless of whether a transaction takes place.*

In any event, these are disputed questions for trial.

**E. Plaintiff States a Claim Under CDAFA.**

The Court also previously considered and rejected Defendant's argument that Plaintiff does not have standing to pursue his CDAFA claim. ECF No. 95 at 15 (rejecting Defendants' argument because "it does appear that the Ninth Circuit has concluded that plaintiffs can establish standing for both Article III and CDAFA purposes under a disgorgement theory, and Shopify hasn't presented any convincing reason to contravene that authority"). Defendants provide no good reason to revisit the Court's prior, correct determination. Instead, Defendants mischaracterize the case law in their misguided attempt to revisit this issue too.

Defendants first attack the Court's determination of standing based on a disgorgement theory, arguing that the Court's reference to *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 589 was misplaced because that case concerned "Article III standing, not CDAFA-specific standing." MTD at 24. But the Ninth Circuit specifically noted that the district court had dismissed claims under CDAFA (as well as the common law) for failure to allege *damages*, stated unequivocally that "[w]e respectfully disagree," and concluded "Plaintiffs sufficiently alleged a state law interest whose violation constitutes an injury sufficient to establish standing to bring their claims for CDAFA violations and California common law trespass to chattels, fraud, and statutory larceny." 956 F.3d at 601. And Defendants do not even address the other case cited by this Court, which held that the logic in *In re Facebook Inc. Internet Tracking Litigation* "applies equally to the issue of whether plaintiffs have suffered 'damage' under CDAFA." ECF. No. 95 at 14–15 (quoting *Smith v. Rack Room Shoes*, No. 24-cv-06709-RFL, 2025 WL 2210002, 2025 LEXIS 354693 (N.D. Cal. Aug. 4, 2025)).

Plaintiff also "alleges monetary loss in a more conventional way." *McClung v. AddShopper, Inc.*, No. 23-cv-01996-VC, 2024 U.S. Dist. LEXIS 8725, at *6–7 (N.D. Cal. Jan. 17, 2024). He alleges that he "would not have purchased products from IABMFG" had he known that Shopify would "install a tracking cookie on his smartphone browser, for the purpose of tracking him" or that Shopify "would collect, store, analyze, and/or transfer his private

information." TAC ¶¶ 76, 77. These allegations are nearly identical to those in *McClung* that sufficed to allege a benefit of the bargain theory of loss. *See McClung*, 2024 U.S. Dist. LEXIS 8725, at *6–7 (plaintiffs alleged they "would not have purchased products from these retailers had they known that it would subject them to the alleged scheme" that sent them "unwanted email communications as a result of those purchases").[5]

Next, Defendants suggest that two decisions by California intermediate appellate courts require the Court to change its prior ruling. MTD at 24. But neither concerned CDAFA. And one did not involve the loss of control of personal data at all. *See Muha v. Experian Info. Sols., Inc.*, 106 Cal. App. 5th 199, 207–10 (2024) (holding plaintiff did not have standing for a claim under FCRA based solely on the omission of a statutorily required statement in their credit reports, where plaintiffs identified no concrete harm from the omission and, in fact, admitted in federal court that they suffered no concrete injury as a result of the alleged FCRA violation). In the other case, the court found plaintiffs adequately alleged standing under the UCL because they "alleged they relied on [defendant's] false representations and promises concerning data security in entering contracts with [defendant] and accepting its pricing terms, paying more than they would have had they known the truth that [defendant] had not implemented and would not maintain adequate data security practices." *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 527–28 (2022) (noting many federal courts "have held plaintiffs adequately pleaded UCL standing under similar benefit-of-the-bargain theories"). This case actually supports Plaintiff's standing. Although the *Moore* court further opined that those plaintiffs had not adequately alleged that they suffered a loss in value of their personal information, *id.* at 538–39, that holding has no relevance either to Plaintiff's disgorgement interest here or to the money he lost as a result of making a purchase that he otherwise would not have made.

Defendants next suggest that the California Uniform Trade Secrets Act ("CUTSA") supersedes Plaintiff's claims. MTD at 24 n.7. Nonsense. By its own terms, CUTSA does not supersede either "other civil remedies that are not based upon misappropriation of a trade secret"

---

[5] Shopify argues that this is not a loss sustained "by reason of the violation." MTD at 25. But the causal connection is direct and concrete: Plaintiff would not have purchased the products had he known of Defendants' misconduct.

or "criminal remedies, whether or not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b). Here, Plaintiff does not allege a misappropriation of a trade secret, and CDAFA and CIPA are criminal statutes.

Defendants' argument that a change to an inconspicuous document on a particular page of the IABMFG website *long after* Plaintiff's purchase in 2019 somehow defeats Plaintiffs' CDAFA claim makes no sense. *See* MTD at 25. Plaintiff does not allege that he saw that document or, if he did at some later point, that he then traveled back in time to 2019.

Finally, Shopify's arguments that there could be no economic harm associated with Plaintiff's 2019 purchase (MTD at 25–26) suffers from multiple flaws. It is contrary to the case law cited above (including the *Moore* case cited by Shopify). It ignores the fact that Plaintiff alleges he would not have made the purchases at all if he had known the truth about Shopify's practices. It presumes facts about pricing that are not in the pleadings and cannot be established at this stage. And it assumes, contrary to what Plaintiff alleges, that full and fair disclosures prior to checkout—about the disturbing extent of Shopify's data collection and usage—would not affect consumers' willingness to proceed with transactions on Shopify's platform.

**F. Plaintiff States a Claim Under the UCL.**

The UCL provides for three distinct causes of action. "Each of these three adjectives [unlawful, unfair, or fraudulent] captures a 'separate and distinct theory of liability.'" *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). Shopify violated all three prongs.

**1. Plaintiff Has Standing.**

Shopify challenges yet another one of this Court's prior holdings by arguing that Plaintiff lacks standing for his UCL claim. *Compare* ECF No. 95 at 16 (concluding "smartphones contain so much personal information about their users that the unlawful access of that information can cause harm, even if in a non-monetary way," and denying Shopify's prior motion to dismiss on this ground) *with* MTD at 26–27. Once again, Shopify disregards Plaintiff's allegations regarding loss of money and loss of value and control of information, and applicable case law. *See* TAC ¶¶ 75–78, 98, 145–146; *see also In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d at 1024–25 (holding a violation of a plaintiff's right to exclude others from using his personal information

constitutes a sufficient diminishment of a property interest for purposes of UCL standing); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (holding loss of personal information can constitute economic injury and provide standing under the UCL). Shopify also ignores other ways Plaintiff has alleged standing for his UCL claim.

To establish standing under the UCL, a plaintiff must have "lost money or property" (that is, have an economic injury) as result of the unfair business practice. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011). There are "innumerable ways" a plaintiff could satisfy this requirement. *Id.* One of the most common ways is if the consumer "would not have bought the product but for" the unfair business practice or that the consumer "paid more than he or she actually valued the product." *Id*. at 330. That is precisely what Plaintiff alleges here: he alleges that he would not have bought the products from IABMFG (and thus surrendered more money than he otherwise would have) had he known of Shopify's misconduct. *See* TAC ¶¶ 75–78. Plaintiff lost a concrete amount of money as a direct result of the UCL violation.

"Courts in California have consistently held that benefit of the bargain damages represents economic injury for purposes of the UCL." *See In re Solara Medical Supplies, LLC Customer Data Security Breach Litigation*, 613 F. Supp. 3d 1284, 1301 (S.D. Cal. May 2020); *accord Moore*, 83 Cal. App. 5th at 527–28 (noting many courts "have held plaintiffs adequately pleaded UCL standing under similar benefit-of-the-bargain theories"). In *McClung*, for example, plaintiffs had standing when they alleged they would not have purchased products had known of the misappropriation of their data and unwanted emails. 2024 U.S. Dist. LEXIS 8725, at *6; *see also Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 854 (N.D. Cal. 2022) (plaintiffs had UCL standing when they alleged "that if Patreon had disclosed the manner in which it shared user data with Facebook, they would not have paid Patreon subscription fees, or at least not in the same amounts.").[6] Plaintiff's allegations are nearly identical.

Shopify attempts to dismiss the well-established benefit-of-the-bargain theory by relying

---

[6] Courts even recognize the benefit-of-the-bargain theory of injury when a consumer did ***not*** buy anything, but merely shared data that the defendant failed to protect. *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d at 1024.

on inapposite Ninth Circuit decisions. *See* MTD at 101; *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861–65 (9th Cir. 2018) (discussing the duty to disclose, not standing);[7] *Naimi v. Starbucks Corp.*, 798 F. App'x 67, 70 (9th Cir. 2019) (discussing standing under New York law). And the district court cases Shopify cites are inconsistent with the weight of authority and a more recent Ninth Circuit decision on standing. *See Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1147 (9th Cir. 2024) (allegations that plaintiff paid for products she would not otherwise have purchased, or would have paid less for, are sufficient for standing). No further details are necessary.

**2. Shopify Engaged in Unlawful Conduct.**

Plaintiff's UCL unlawful prong claims "borrow[] violations of other laws and makes those unlawful practices actionable under the UCL." *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1383 (2012). "[V]irtually any state, federal, or local law can serve as the predicate." *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1052 (9th Cir. 2017) (internal quotation marks omitted). Plaintiff predicates his unlawful claims on the causes of action discussed above as well as other statutes. This means that if ***any*** of the other claims proceed, so too must the claim under the UCL unlawful prong. *See, e.g., Pac. Steel Grp. v. Commer. Metals Co.*, 600 F. Supp. 3d 1056, 1082 (N.D. Cal. 2022) (UCL unlawful claims "rise and fall" with the predicate claims).

Because Shopify's challenges to Plaintiff's CIPA and CDAFA claims fail, for the reasons stated above, Plaintiff also has a UCL claim based on those statutory violations.

Plaintiff also pleads violations of CalOPPA. TAC ¶¶ 141–42. CalOPPA requires the "operator" of a commercial website or online service "that collects personally identifiable information through the internet about individual consumers residing in California who use or visit its commercial website or online service" to "conspicuously post its privacy policy on its website or in the case of the operator of an online service, make that policy available . . . ." Cal. Bus. & Prof. Code § 22575(a). The TAC sufficiently alleges Shopify is the operator of various websites (TAC ¶¶ 24, 35, 67) but that it does not conspicuously post its privacy policy on those websites (TAC ¶¶ 45, 142). Moreover, Shopify has been on notice of Plaintiff's claims (and

---

[7] Shopify argues that omissions are not actionable unless they pertain to product defects, but that is not true, as explained below. It also has no bearing on the unlawful and unfair prongs.

Shopify's noncompliance) for years and still has not conspicuously posted its privacy policy on all relevant websites. Accordingly, CalOPPA is another viable basis for Plaintiff's UCL claim at this stage.

Shopify argues the CCPA cannot be a predicate because it does not have its own right of action. But the Ninth Circuit has held: "[i]t does not matter whether the underlying statute also provides for a private cause of action; [the UCL] can form the basis for a private cause of action even if the predicate statute does not." *Chabner v. United of Omaha Life Ins., Co.*, 225 F. 3d 1042, 1048 (9th Cir. 2000). The UCL is limited in only very narrow circumstances; there must be an actual bar on an action.

Plaintiff states a claim under the UCL for unlawful conduct.

**3. Shopify Violated the Fraud Prong.**

Plaintiff's claim under the UCL fraud prong alleges that Shopify committed fraud by failing to disclose its interception, collection, tracking, use, and disclosure of users' data. TAC ¶ 135. Shopify contends "omissions are only actionable under the UCL if they concern 'physical defects that affect the central function of the [product].'" MTD at 28. It is wrong. Omissions are actionable under the UCL when the omission is "contrary to a representation actually made by the defendant, or an omission of a fact that defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co*., 144 Cal. App. 4th 824, 835 (2006); *accord Brown v. Brita Prods. Co.*, No. 24-6678, 2026 U.S. App. LEXIS 10874, at *10 (9th Cir. Apr. 16, 2026). A duty to disclose arises "when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff" and "when the defendant *actively conceals* a material fact from the plaintiff." *Collins v. eMachines, Inc*., 202 Cal. App. 4th 249, 255 (2011). The duty is not limited to product defects. Courts recognize the duty in cases involving the handling of data. *See Stark*, 635 F. Supp. 3d at 855–56 (finding "Patreon's disclosure of limited data sharing gave rise to a duty to disclose "); *In re Solara Med. Supplies, LLC*, 613 F. Supp. 3d at 1303 (finding "a duty to disclose based upon [d]efendant's exclusive knowledge of the alleged inadequacy of its security measures"); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1113–14 (N.D. Cal. 2015) (duty to disclose when defendants had exclusive knowledge of the

information related to software).

Defendants had a duty to disclose their interception, collection, tracking, use, and disclosure of Plaintiff's private information. These facts are material because a "reasonable [consumer] would deem it important in determining how to act in the transaction at issue." *Collins*, 202 Cal. App. 4th at 255; *see also In re Adobe Sys. Privacy Litig*., 66 F. Supp. 3d 1197, 1231 (N.D. Cal. 2014) (finding Adobe had a duty to disclose "that its security practices were not up to industry standards"). The TAC further alleges that this information was material to Plaintiff's purchases since he "would not have entered into financial transactions involving Shopify" or "purchased products from IABMFG" had he known that Defendants would "track[] him across potentially hundreds of thousands, if not millions, of websites;" "collect, store, analyze, and/or transfer his private information;" and make his private information "available to potentially millions of merchants." TAC ¶¶ 75–77. These allegations are sufficient to establish materiality. *See Doe v. Successfulmatch.com*, 70 F. Supp. 3d 1066, 1079–80 (N.D. Cal. 2014) (finding that information was material where plaintiffs alleged that "had they known their profiles would always be shared on an unknown number of affiliate sites, they would not have purchased Defendant's service").

The TAC alleges that Shopify had exclusive knowledge of these material facts that were not known or reasonably accessible to Plaintiff and that Shopify actively concealed these material facts. TAC ¶¶ 26, 30, 59, 61, 63, 71, 79, 100, 135, 139. Plaintiff did not know about Shopify's involvement in the transactions. *Id*. Nor could he because Shopify actively hid its role by designing its payment forms to look as if they belonged to the merchant, not Defendants. TAC ¶¶ 4, 26, 63, 100, 107, 128, 140. These facts are more than sufficient to withstand dismissal.

**4. Shopify Engaged in Unfair Conduct.**

Courts use three different tests to determine whether a practice is "unfair": (1) the tethering test, (2) the balancing test, and (3) the FTC test. *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256–57 (2010). Plaintiff alleges unfair practices under each of these tests.

The tethering test evaluates whether an alleged practice violates public policy "tethered to specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256.

Allegations establishing an actual statutory violation are not necessary; rather, allegations establishing that a defendant's conduct "offends an established public policy" will suffice. *See Rovai v. Select Portfolio Servicing, LLC*, No. 14-cv-1738-BAS-WVG, 2018 U.S. Dist. LEXIS 107764, at *45 (S.D. Cal. June 27, 2018). Here, Plaintiff plausibly alleges that Defendants have committed actual violations of CIPA, CDAFA, and CalOPPA, as discussed above. Even if the Court finds that the TAC does not allege actual violations, Plaintiff's allegations still pass muster under the tethering test since Defendants' conduct violates the public policy underlying those statutes. *See Matera v. Google, Inc.*, No. 15-CV-04062-LHK, 2016 U.S. Dist. LEXIS 107918, at *59–60 (N.D. Cal. August 12, 2016) (discussing the legislative intent to establish strong and broad privacy protections under CIPA).

The second test—the balancing test—asks whether the alleged practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. *See Drum*, 182 Cal. App. 4th at 257; *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023). The balancing test is similar to the FTC test. The FTC test provides that a practice is unfair if (1) the consumer injury is substantial; (2) it is not outweighed by any countervailing benefits; and (3) consumers could not reasonably have avoided the injury. *Drum*, 182 Cal. App. 4th at 257.

The balancing test is fact-driven and "requires a review of the evidence." *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006). For that reason, it cannot usually be determined on the pleadings. *Id.*; *see also Rovai*, 2018 U.S. Dist. LEXIS 107764, at *47 (the balancing test is not "a particularly difficult test to satisfy at the motion to dismiss stage").

The TAC alleges that Class members were harmed because "Shopify intruded on communications" that they "believed to be private" and then shared Class members' data with numerous third parties who, in turn, shared the data with other third-parties. TAC ¶ 137. The resulting harm is not outweighed by any countervailing utility. Defendants represent that they collect and use the data for fraud prevention purposes. *See* TAC ¶ 54 fig. 5. While fraud prevention may be a noble goal, it does not outweigh the surreptitious theft of millions of

consumers' financial data, nor spying on consumers' activity across the internet. Indeed, nothing prevents Defendants from engaging in their fraud prevention efforts *so long as they ask for permission first*. Without taking that necessary (and relatively simple) step, Shopify's privacy violations on a massive scale outweigh the commercial benefits it touts; at a minimum, the issue cannot be decided on the pleadings. *See McCoy v. Alphabet, Inc.*, No. 20-cv-05427-SVK, 2021 U.S. Dist. LEXIS 24180, at *30–31 (N.D. Cal. Feb. 2, 2021) (court cannot say that the "benefit of collecting information outweighs harm to privacy rights"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1073 (N.D. Cal. 2012) ("However, at this juncture the Court cannot say that Apple's practices are not injurious to consumers, or that any benefit to consumers outweighs the harm."); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d at 844 ("The Court cannot say, as a matter of law, that the utility of the Google Assistant necessarily outweighs the harm from false accepts."). Finally, the harm is not reasonably avoidable until Shopify fairly disclose its role and its practices. Therefore, Plaintiff has alleged a violation of the unfair prong of the UCL under each of the tests.

### B. Plaintiff Requests Leave to Amend if Necessary.

Should this Court find any claims insufficient, Plaintiff requests leave to cure the deficiencies. "[L]eave to amend should be granted unless the Court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co*., 806 F.2d 1393, 1401 (9th Cir. 1986).

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss must be denied.

Dated: April 29, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier /s/*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Hayley Reynolds (State Bar No. 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Stephen M. Raab (admitted *pro hac vice*)
stephen@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*